**GENERAL MOTORS CORPORATION and Lawrence Marshall Chevrolet Oldsmobile, Inc., Petitioners,**

v.

**A.J. SANCHEZ, et al., Respondents.**

**No. 98–0442.**

Supreme Court of Texas.

Argued Jan. 12, 1999.

Decided July 1, 1999.

Ruth G. Malinas, San Antonio, David M. Heibron, Leslie G. Landau, San Francisco, CA, for Petitioners.

Rebecca E. Hamilton, Todd W. White, Rockwall, Guy H. Allison, Russell H. McMains, Robert J. Patterson, Corpus Christi, Stacy L. Keaton, Austin, for Respondents.

Justice GONZALES delivered the opinion for a unanimous Court.

The principal question in this case is when does the doctrine of comparative responsibility apply in a products-liability case. Relying on its reading of our decision in *Keen v. Ashot Ashkelon, Ltd.*,[1] the court of appeals held that the decedent's responsibility for the accident that resulted in his death should not be compared with the manufacturer's responsibility because

---

1. 748 S.W.2d 91 (Tex.1988).

the decedent's actions merely amounted to the failure to discover or guard against a product defect.[2] We conclude that: (1) comparative responsibility applies in strict liability if a plaintiff's negligence is something other than the mere failure to discover or guard against a product defect, and (2) there was evidence here the decedent was negligent apart from the mere failure to discover or guard against a product defect. We also conclude that punitive damages may not be awarded in this case because the evidence is legally insufficient to support the finding of gross negligence. Therefore, we reverse the court of appeals' judgment and render judgment for the plaintiffs' actual damages, as reduced by the jury's comparative responsibility finding.

## I

Because there were no witnesses, relatively little is known first hand about the circumstances of the accident that is the basis of this litigation. Lee Sanchez, Jr. left his home to feed a pen of heifers in March 1993. The ranch foreman found his lifeless body the next morning and immediately called Sanchez's father. Apparently, Sanchez's 1990 Chevy pickup had rolled backward with the driver's side door open pinning Sanchez to the open corral gate in the angle between the open door and the cab of the truck. Sanchez suffered a broken right arm and damaged right knee where the gate crushed him against the door pillar, the vertical metal column to which the door is hinged. He bled to death from a deep laceration in his right upper arm.

The Sanchez family, his estate, and his wife sued General Motors Corporation and the dealership that sold the pickup for negligence, products liability, and gross negligence based on a defect in the truck's transmission and transmission-control linkage. The plaintiffs presented circumstantial evidence to support the following theory of how the accident happened. Sanchez drove his truck into the corral and stopped to close the gate. He mis-shifted into what he thought was Park, but what was actually an intermediate, "perched" position between Park and Reverse where the transmission was in "hydraulic neutral." Expert witnesses explained that hydraulic neutral exists at the intermediate positions between the denominated gears, Park, Reverse, Neutral, Drive, and Low, where no gear is actually engaged. Under this scenario, as Sanchez walked toward the gate, the gear shift slipped from the perched position of hydraulic neutral into Reverse and the truck started to roll backwards. It caught Sanchez at or near the gate and slammed him up against it, trapping his right arm and knee. He was pinned between the gate and the door pillar by the pressure the truck exerted while idling in Reverse. Struggling to free himself, Sanchez severed an artery in his right arm and bled to death after 45 to 75 minutes.

In the trial court, G.M. offered alternative theories explaining the cause of the accident, all of which directed blame at Sanchez. It suggested that Sanchez left his truck in Reverse either accidentally or in a conscious attempt to prevent cattle from escaping the corral. Alternatively, G.M. suggested that Sanchez simply left the truck in Neutral and it rolled down the five degree slope toward the gate. Finally, G.M. argued that even if the accident was caused by a mis-shift as alleged by the plaintiffs, the mis-shift was a result of operator error, and not a defect in design.

The jury rejected G.M.'s theories and found that G.M. was negligent, the transmission was defectively designed, and G.M.'s warning was so inadequate as to constitute a marketing defect. The jury also found that Sanchez was fifty percent responsible for the accident, but the trial court disregarded this finding. The trial court rendered judgment for actual and punitive damages of $8.5 million for the plaintiffs. A panel of the court of appeals affirmed the trial court's judgment with one justice dissenting.[3] Sitting en banc, a

---

2. 966 S.W.2d 545, 555.

3. 966 S.W.2d 545.

majority of the court of appeals adopted the panel's opinion and judgment.[4] Two justices joined the dissent, and one concurred in the judgment.[5]

G.M. argues that there is no evidence to support liability for negligence or strict liability. Alternatively, G.M. challenges the trial court's refusal to apply the comparative responsibility statute.[6] The plaintiffs respond that evidence supports both the negligence and strict liability findings, and that Sanchez's negligence was nothing more than a failure to discover or guard against a product defect. Thus, they contend, comparative responsibility does not apply here as a defense to strict liability.

Here, G.M. does not dispute that Sanchez's fatal injury was caused when he mis-shifted the truck's transmission into hydraulic neutral, which then migrated into Reverse. The parties agree that all transmissions made today can mis-shift, that no design eliminates the possibility of a mis-shift, and that a mis-shifted car is dangerous. As G.M. puts it, a "[m]is-shift is just physics." G.M. contends that it has no liability, even if its product is defective, because the plaintiffs failed to present evidence of a safer alternative design.

■ We consider first the evidence of strict liability. We will sustain G.M.'s no evidence point only if there is no more than a scintilla of evidence to prove the existence of a product defect.[7]

## II

■ A design defect renders a product unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use.[8] A plaintiff must prove that there is a safer

alternative design in order to recover under a design defect theory.[9] An alternative design must substantially reduce the risk of injury and be both economically and technologically feasible.[10] We first examine the evidence concerning the operation of the transmission in Sanchez's truck and then determine whether the plaintiffs have proven a safer alternative design.

## A

Most of the plaintiff's design evidence came in through the testimony of the plaintiffs' expert, Simon Tamny, who testified about the operation of the 700R4 transmission in Sanchez's truck. He opined that the G.M. transmission and transmission-control linkage presented a particular risk. All transmissions have an intermediate position between Reverse and Park. It is impossible, under federal standardization guidelines, to design a gear shift without an intermediate position between Reverse and Park. However, Tamny testified that G.M.'s transmission has the added danger that internal forces tend to move the gear selector toward Reverse rather than Park when the driver inadvertently leaves the lever in this intermediate position. Tamny explained how G.M. could alter the design to make the operation of the 700R4 safer.

When a driver moves the gearshift of Sanchez's truck from one position to another, a system of rod linkage transmits the motion from the gearshift on the steering column to the manual lever of the transmission. The manual lever is a semicircular part which is also known as the "rooster comb" because of the series of tooth-like peaks and dips along the perim-

---

4.  974 S.W.2d 407.

5.  *Id.*

6.  *See* Tex. Civ. Prac. & Rem. Code § 33.012.

7.  *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex. 1990) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L. Rev. 361, 362–363 (1960)).

8.  *See American Tobacco Co., Inc. v. Grinnell,* 951 S.W.2d 420, 432 (Tex.1997).

9.  *See Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 384 (Tex.1995).

10.  *See* Tex. Civ. Prac. & Rem. Code § 82.005(b)(1) & (2).

trial court.[15] Because the only evidence to prove causation was not competent, we sustained the legal sufficiency challenge.[16] To allow a *Robinson* challenge here, when G.M. did not object at all in the trial court to the reliability of the expert evidence, "would deny [the plaintiffs'] experts the opportunity to 'pass muster' in the first instance and usurp the trial court's discretion as 'gatekeeper.'"[17]

G.M. argues that regardless of our resolution of the *Robinson* issues, the substance of Tamny's testimony does not amount to evidence of a safer alternative design. G.M. contends that Tamny's testimony was based on "speculation and conjecture," citing *Schaefer v. Texas Employers' Insurance Association*[18] and *Burroughs Wellcome Co. v. Crye.*[19] We disagree. In *Schaefer*, an expert testified that in his opinion, Schaefer's disease resulted from his employment. The expert based his opinion on his assumptions that Schaefer had contracted the avian form of a certain disease, that the pathogen causing the disease was present in bird droppings at Schaefer's workplace, and that Schaefer had contracted the disease from the bird droppings.[20] No evidence was introduced to show that Schaefer had the avian form of the disease. No evidence was introduced to show that bird droppings at Schaefer's workplace were infected with the pathogen. Likewise, no evidence was introduced to show how Schaefer contracted the disease. Based on that record, we held that the expert's opinion was founded upon mere possibility, speculation, and surmise.[21] In *Burroughs Wellcome Co.*, Crye suffered an injury to her foot that she attributed to frostbite from using the defendant's antiseptic spray.[22] Crye's expert assumed that her foot turned white after she applied the spray. He attributed this symptom to frostbite in giving his opinion and stated that had the foot turned red, his diagnosis would be different.[23] At trial, the testimony indicated that Crye's foot turned red after application of the antiseptic spray. We held that when the only facts in evidence contradict the assumption of the expert upon which his opinion is based, his opinion is "without probative value and cannot support a verdict or judgment."[24]

Unlike *Schaefer* or *Burroughs Wellcome Co.*, here there is more to the evidence than an expert's bald assertion that his design would be safer. Tamny described the current operation of the 700R4 transmission at length, and explained in some detail how his proposed design would make the transmission safer by eliminating the risk that the vehicle could move in a powered gear due to an inadvertent mis-shift. "It will take you from a 90% solution to a 99% solution," he said. Tamny's testimony about the engineering principles underlying his proposed design support his conclusion that his design features would be safer than those in the 700R4.

G.M. mis-characterizes Tamny's testimony by considering whether each individual feature of Tamny's design makes the design safer, instead of considering the design as a whole, and by considering the plaintiffs' testimony in light of its statistical evidence instead of considering the plaintiffs' evidence alone. G.M. argues that none of the other manufacturers' designs incorporating different aspects of Tamny's design have proven safer than G.M.'s and that Tamny offered no testing evidence or engineering principles to show his design was safer. Without this evidence, G.M. concludes, Tamny's opinion is mere speculation.

**15.** *See id.* at 709.

**16.** *See id.* at 730.

**17.** *Ellis,* 971 S.W.2d at 411.

**18.** 612 S.W.2d 199, 202, 204–205 (Tex.1980).

**19.** 907 S.W.2d 497, 499–500 (Tex.1995).

**20.** *See Schaefer,* 612 S.W.2d at 204.

**21.** *See id.*

**22.** *See Burroughs,* 907 S.W.2d at 498.

**23.** *See id.* at 499.

**24.** *Id.*

■ However, the plaintiffs did not have to build and test an automobile transmission to prove a safer alternative design. A design need only prove "capable of being developed."[25] The *Restatement (Third) of Torts: Products Liability* takes the position that "qualified expert testimony on the issue suffices, even though the expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale."[26] Furthermore, assuming we could consider evidence contrary to the verdict,[27] no manufacturer has incorporated Tammy's design into an existing transmission. For that reason alone, G.M.'s statistical evidence comparing the safety of different existing designs could not conclusively establish the safety of Tamny's design.

The evidence supporting Tamny's conclusion that his design is safer raises a fact question that the jury resolved in favor of the plaintiffs. We conclude that the plaintiffs have presented more than a scintilla of evidence that Tamny's alternative design substantially reduced the risk of injury.

Having determined that the plaintiffs met their burden of proving some evidence of design defect, we need not consider G.M.'s challenge to the findings of a marketing defect or negligence. We next consider whether to give effect to the jury's comparative responsibility findings.

## III

■ The jury found that Sanchez was fifty percent responsible for his accident.

G.M. argues that this finding should be applied to reduce its liability for damages whether in negligence or strict liability. However, the plaintiffs argue that Sanchez's actions amounted to no more than a failure to discover or guard against a product defect and, because of our decision in *Keen v. Ashot Ashkelon, Ltd.*,[28] such negligence does not constitute a defense to strict liability. To review the plaintiffs' claim, we must first consider the effect of the 1987 revisions to Chapter 33 of the Civil Practice and Remedies Code upon our decision in *Keen*.

Before 1987, cases were submitted under the statutory comparative negligence system of Chapter 33 of the Texas Civil Practice and Remedies Code.[29] Comparative negligence explicitly governed only claims for negligence. If strict liability was asserted against any defendant, comparative negligence did not apply.[30] Because *Keen* was filed before the effective date of the 1987 revisions to Chapter 33 and involved a claim based in strict liability, the statute did not apply. Thus, in *Keen* the common law of *Duncan v. Cessna Aircraft Co.*[31] governed the effect of a claimant's negligence on a strict liability claim.[32] In *Duncan*, this Court adopted a comparative causation scheme in strict liability cases that allowed comparison of a plaintiff's conduct regardless of whether it should be characterized as assumption of the risk, misuse, or failure to mitigate or avoid damages.[33] It reaffirmed the rule in comment "n" to § 402A of the *Restatement (Second) of Torts*, that negligent failure to discover or guard against a product defect is not a defense.[34]

**25.** See *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743 (Tex.1980).

**26.** RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f (1998).

**27.** See *Continental Coffee Prods. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996).

**28.** 748 S.W.2d at 92 (failure to discover or guard against a defect is no defense to a strict liability claim).

**29.** See TEX. CIV. PRAC. & REM.CODE § 33.001 et seq.

**30.** See *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 423 (Tex.1984).

**31.** See id.

**32.** See *Keen,* 748 S.W.2d at 93.

**33.** See *Duncan,* 665 S.W.2d at 428.

**34.** See id. at 432; see also *Dresser Indus., Inc. v. Lee,* 880 S.W.2d 750, 755 (Tex.1993).

Relying on *Duncan*, the *Keen* majority held that a negligent failure to discover or guard against a product defect is not a defense against strict liability.[35] The Court characterized the plaintiff's conduct as a failure to discover or guard against a product defect, rather than an assumption of a known risk, thus implying that these were the only two choices.[36] The Court therefore refused to apply the jury's comparative causation finding to reduce recoverable damages.

The scope of the Court's holding in *Keen* is difficult to assess when read in light of (1) the language in *Duncan* that seems to recognize the existence of a type of conduct that was more than a mere failure to discover or guard against a product defect and less than an assumption of the risk[37] and (2) the unanswered criticism of the majority opinion in the dissenting opinions by Chief Justice Phillips and Justice Gonzalez.[38] Both dissenting opinions fault the majority for considering only two types of plaintiff conduct: the failure to discover or guard against a product defect and assumption of the risk.[39] Both dissents argued that the plaintiff in *Keen* was negligent without regard to any defect, and such negligence should be considered when apportioning responsibility.[40] The *Keen* majority did not respond to this criticism, however. Thus, after *Keen*, it was unclear whether a plaintiff's negligence other than a failure to discover or guard against a product defect should be submitted as part of a comparative responsibility inquiry.

■ In 1987, the Legislature changed Chapter 33 from comparative negligence to comparative responsibility. Under comparative responsibility, a court reduces a claimant's damages recovery by the "per-centage of responsibility" attributed to him by the trier of fact.[41] The new statute expressly included suits based on strict tort liability.[42] It defined "Percentage of responsibility" as the percentage that a party "cause[d] or contribute[d] to cause in any way, whether by *negligent act or omission*, ... [or] by *other conduct or activity violative of the applicable legal standard*" the harm for which damages are sought.[43] Thus, as the emphasized language indicates, the new statute applies to a claimant's conduct that violated the duty to use ordinary care or some other applicable legal standard.

G.M. contends that the 1987 revisions of Chapter 33 effectively overrule *Keen*. It is not quite that simple. Implicit in this Court's holding in *Keen* was that a consumer has no duty to discover or guard against a product defect.[44] The 1987 changes to Chapter 33, which apportion responsibility based on a breach of a legal duty or other applicable legal standard, do not impose a new duty on plaintiffs. The statute merely says that if a claimant breaches an existing duty, then comparative responsibility shall apply. Accordingly, if a plaintiff's failure to discover or guard against a product defect breaches no duty, the statute does not apply.

■ Thus, *Keen*'s viability after the 1987 revisions depends on whether a plaintiff in a strict liability case has a duty to take steps to discover and guard against product defects. The *Duncan* Court refused to recognize such a failure as a defense, relying in part on comment n to section 402A of the *Restatement (Second):*[45]

35. *See Keen*, 748 S.W.2d at 93.

36. *See id.* at 92–93.

37. *See Duncan*, 665 S.W.2d at 422.

38. *See Keen*, 748 S.W.2d at 94 & 96.

39. *See id.* at 94 & 99.

40. *See id.*

41. *See* TEX. CIV. PRAC. & REM.CODE § 33.012(a).

42. *See id.* § 33.003.

43. *Id.* § 33.011(4) (emphasis added).

44. *See Keen*, 748 S.W.2d at 92–93; *see also Dresser Indus.*, 880 S.W.2d at 755.

45. *See Duncan*, 665 S.W.2d at 432.

Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.[46]

We note that comment "n" was not carried forward in the *Restatement (Third)*.[47] The position of *Restatement (Third)*, section 17(a), is that a plaintiff's conduct should be considered to reduce a damages recovery if it fails to conform to applicable standards of care, similar to the Texas 1987 statutory scheme. However, comment "d" to *Restatement (Third)* states:

[W]hen the defendant claims that the plaintiff failed to discover a defect, there must be evidence that the plaintiff's conduct in failing to discover a defect did, in fact, fail to meet a standard of reasonable care. In general, a plaintiff has no reason to expect that a new product contains a defect and would have little reason to be on guard to discover it.[48]

We believe that a duty to discover defects, and to take precautions in constant anticipation that a product might have a defect, would defeat the purposes of strict liability.[49] Thus, we hold that a consumer has no duty to discover or guard against a product defect, but a consumer's conduct other than the mere failure to discover or guard against a product defect is subject to comparative responsibility. Public policy favors reasonable conduct by consumers regardless of whether a product is defective. A consumer is not relieved of the responsibility to act reasonably nor may a consumer fail to take reasonable precautions regardless of a known or unknown product defect. We therefore disapprove of *Keen* to the extent it suggests that the failure to discover or guard against a product defect is a broad category that includes all conduct except the assumption of a known risk. Because we conclude that a consumer has no duty to discover or guard against a product defect, we next determine whether the decedent's conduct in this case was merely the failure to discover or guard against a product defect or some other negligence unrelated to a product defect.

The truck's owner's manual describes safety measures designed to ensure that the truck would not move when parked: (1) set the parking brake; (2) place the truck completely in Park; (3) turn off the engine; (4) remove the key from the ignition; and (5) check that Park is fully engaged by pulling down on the gear shift. Sanchez's father testified that his son probably read the entire owner's manual. The plaintiff's own experts agreed at trial that Sanchez failed to perform any of the safety measures described in the owner's manual and that performing any one of them would have prevented the accident. This evidence is sufficient to support the jury's negligence finding.

Regardless of any danger of a mis-shift, a driver has a duty to take reasonable precautions to secure his vehicle before getting out of it. The danger that it could roll, or move if the engine is running, exists independently of the possi-

---

46. *See* RESTATEMENT (SECOND) OF TORTS § 402A cmt. n (1964).

47. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 17 cmt. a (1998).

48. *Id.* cmt d.

49. *See Keen*, 748 S.W.2d at 93 (consumers have a right to rely on product safety); *see also Duncan*, 665 S.W.2d at 432; William J. McNichols, *The Relevance of the plaintiff's Misconduct in Strict Tort Products Liability, the Advent of Comparative Responsibility, and the Proposed Restatement (Third) of Torts*, 47 OKLA L.REV. 201, 260 (1994).

bility of a mis-shift. For instance, the driver could inadvertently leave a vehicle in gear or a mechanical problem unrelated to a product defect could prevent Park from fully engaging. A moving vehicle without a driver is a hazard to public safety. The state licenses drivers who have demonstrated the minimum knowledge and skill necessary to safely operate a motor vehicle.[50] Many, perhaps most, consumer products may be operated without a license, including lawn and garden equipment, household appliances, and powered hand tools. It follows then that, because of this licensing requirement, as well as other special duties imposed on drivers,[51] more is expected of an operator of a motor vehicle than of users of most other consumer products. Thus, although we do not expect the average driver to have the engineering background to discover defects in their car's transmission, we do expect the reasonably prudent driver to take safety precautions to prevent a runaway car.[52] Sanchez had a responsibility to operate his truck in a safe manner. The fact that the precautions demanded of a driver generally would have prevented this accident does not make Sanchez's negligence a mere failure to discover or guard against a mis-shift.

We recognize that there may be some tension between how we apply the law to the facts of this case and the *Keen* majority's characterization of the plaintiff's conduct in that case. As discussed previously, the *Keen* analysis was flawed from the outset because it recognized only two categories of plaintiff conduct: mere failure to discover or guard against a defect and assumption of the risk. All conduct that was not assumption of the risk was categorized as failure to discover or guard

against a defect and thus no defense. Today, we hold that a plaintiff's conduct other than the mere failure to discover or guard against a product defect is subject to comparative responsibility.

Sanchez's actions amounted to conduct other than a mere failure to discover or guard against a product defect. We hold as a matter of law that such conduct must be scrutinized under the duty to use ordinary care or other applicable duty. We conclude that there was legally sufficient evidence to support the jury's verdict that Sanchez breached the duty to use ordinary care and was fifty percent responsible for the accident.

## IV

■■■■■ We next consider the punitive damages award. The plaintiffs are entitled to punitive damages if they established all elements of gross negligence. Broadly speaking, gross negligence is the breach of duty involving an extreme degree of risk, considering the probability and magnitude of the potential harm to others (an objective element) when the actor has actual awareness of the risk involved but nevertheless proceeds in conscious indifference to the rights, safety, or welfare of others (a subjective element).[53] Evidence of gross negligence is legally sufficient if, considered as a whole in the light most favorable to the prevailing party, it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.[54] Some evidence of simple negligence is not evidence of gross negligence; conversely, some evidence of care does not defeat a gross negligence finding.[55]

---

**50.** *See* TEX. TRANS. CODE § 521.161.

**51.** *See e.g. id.* §§ 545.001–.423 (operation of a motor vehicle); 548.001 et seq. (compulsory car inspection); 601.051 & 601.072 (insurance required).

**52.** *See e.g. id.* § 545.404 (engine must be turned off, ignition locked, keys removed, and brake set).

**53.** *See Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 24–25 (Tex.1994)

**54.** *See id.* at 25.

**55.** *See id.* at 20–22.

Only G.M.'s own gross negligence, either by the corporation's own acts or omissions or by the agents' or employees' acts or omissions that are attributable to the corporation, will support punitive damages against it.[56] A court reviews all surrounding facts and circumstances to decide if a corporation itself is grossly negligent.[57] The inquiry "is determined by reasonable inferences the factfinder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiff's alleged damages."[58]

## A

We first decide whether the evidence of the objective element, when considered as a whole, is legally sufficient. We have said that an "extreme degree of risk" is a likelihood of serious injury.[59] G.M.'s experts agreed that a mis-shifted automobile is very dangerous. The only dispute is whether the evidence is legally sufficient to show the likelihood of serious injury. We conclude the evidence is sufficient. The plaintiffs' expert, Tamny, knew of "about 500" mis-shift cases. In experiments, the transmission migrated into Reverse each time Tamny intentionally mis-shifted. G.M.'s experts admitted they had just testified in a similar case in California. G.M.'s statistical evidence tended to show that the possibility of serious injury was remote, but reasonable minds could differ about the degree of risk. Thus the evidence supports the objective element.

## B

The subjective element requires proof that the defendant knew about the danger, but its acts or omissions demonstrate that it did not care.[60] This element may be shown by direct or circumstantial evidence.[61] Much of the evidence the court of appeals discussed, including the bases for the expert opinions, was relevant to the issue of the degree of risk and G.M.'s knowledge of the danger, but did not show that G.M. was consciously indifferent. Considered as a whole, the evidence here rises to the level that reasonable minds could differ over whether G.M. was actually aware of the mis-shift danger, but that does not establish conscious indifference.

To show G.M.'s conscious indifference, the plaintiffs offered expert testimony from Juan Hererra, who characterized G.M.'s conduct as a "conscious decision," and Tamny, who said that G.M. "knew that people were getting hurt and they made the decision not to do anything about the design ... or to warn properly."

Hererra's tautological statement sheds little light on the relevant issue, whether G.M. was consciously indifferent to a known serious risk. Moreover, Hererra gave his opinion in response to a hypothetical question about a manufacturer who gives no warning. Here, G.M. gave a warning, which we will discuss presently. If an expert's opinion is based on facts that are materially different from the facts in evidence, then the opinion is not evidence.[62] As for Tamny's testimony, the fact that G.M. did not implement a new design is not evidence it was not working on the problem. G.M. presented evidence of engineering work over a period of years to modify and improve its transmissions. An example is the 1989 patent application describing a design to alleviate the mis-shift problem. The 1989 design could not be implemented because federal standardization guidelines require the Park, Reverse, Neutral, Drive, Low shift pattern.

56.  See *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998).

57.  See *id.* at 922.

58.  *Id.*

59.  See *id.* at 921.

60.  See *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex.1993).

61.  See *Moriel*, 879 S.W.2d at 23.

62.  See *Burroughs Wellcome Co.*, 907 S.W.2d at 499–500; *Schaefer*, 612 S.W.2d at 204–205.

■ Moreover, there was no evidence that G.M. was aware of any other design with a better safety record than the 700R4 transmission. While Tamny testified as to his own alternative design, there is no evidence of G.M.'s prior knowledge of it. We do not believe that G.M. can be consciously indifferent solely for failing to adopt a safer design it did not know existed. One of the main factors supporting punitive damages in many product defect cases is the fact that the manufacturer is aware of specific design changes that would have made the product safer.[63] In *Grimshaw* for instance, Ford deliberately chose to implement a more dangerous design because it believed that it would save more money than it would have to pay out in damages.[64] There is no such evidence in this case.[65] No evidence supports the inference that G.M. made a conscious choice to implement a more dangerous design in preference to a known safer one that would have substantially reduced the risk.

■ As for the warning, the court of appeals concluded that G.M.'s warning was so vague that it would allow an inference that G.M. consciously decided to downplay the mis-shift danger. But an inference must not be based on mere surmise or speculation.[66] G.M. warned:

> CAUTION: It can be dangerous to get out of your vehicle if . . . your shift lever is not fully in "P" (Park). . . . Your vehicle can roll. If you have left the engine running, the vehicle can move suddenly. You or others could be injured. To be sure your vehicle won't move, even when you're parking on level ground, follow the steps below.

. . .

1. Hold the regular brake pedal down with your right foot and apply the parking brake all the way first. . . .

2. To move the shift lever into "P" (Park), pull the lever toward you and move it up as far as it will go.

3. [applicable to four-wheel drive only] . . .

4. If you don't have to leave the engine running, (briefly)—

• Move the ignition key to "LOCK."

• Remove the key and take it with you.

5. Before you leave the driver's seat, check that your vehicle is in park by trying to pull the shift lever out of "P" (Park)—by pulling down on the shift lever without first pulling it toward you. If you can do this, it means the shift lever wasn't fully locked into "P" (Park). Or, check that your vehicle is in park by pocketing the key. If you can remove the key, the vehicle is in "P" (Park).

While the warning here does not use the word "mis-shift," it does warn that a vehicle not "fully in Park" could "move suddenly" and could be dangerous. It is not necessary to know the specific engineering facts about hydraulic neutral to appreciate that a vehicle can be shifted into something less than full Park. G.M. could have explicitly warned its customers that the vehicle can migrate into a powered gear if not fully in Park, but no other manufacturer has such a warning, and it was undisputed that following any one of the precautions contained in the warning would have

**63.** *See Dorsey v. Honda Motor Co., Ltd.,* 655 F.2d 650, 657 (5th Cir.1981); *Gillham v. Admiral Corp.,* 523 F.2d 102, 107–08 n. 3 (6th Cir.1975); *Grinshaw v. Ford Motor Co.,* 119 Cal.App.3d 757, 813–14, 174 Cal.Rptr. 348 (Cal.Ct.App.1981); *Jardel Co., Inc. v. Hughes,* 523 A.2d 518, 530–31 (Del.1987); *Gryc v. Dayton–Hudson Corp.,* 297 N.W.2d 727, 740 (Minn.1980); *Leichtamer v. American Motors Corp.,* 67 Ohio St.2d 456, 424 N.E.2d 568, 580 (1981); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 462 (1980).

**64.** *See Grimshaw,* 119 Cal.App.3d at 813–14, 174 Cal.Rptr. 348.

**65.** *See supra* page 591 (The only designs G.M. was aware of were other manufacturers' which, according to G.M.'s statistical expert, had the same accident rate as G.M.).

**66.** *See Briones v. Levine's Dept. Store,* 446 S.W.2d 7, 10 (Tex.1969).

prevented the accident. The issue in gross negligence is not whether G.M. developed and used the best warning imaginable. We believe this warning, standing alone, does not provide a reasonable basis upon which to infer conscious indifference.

After reviewing the evidence in this case under the *Moriel* standard, we hold the evidence of conscious indifference is not legally sufficient to support the gross negligence finding.

## V

In conclusion, we hold that (1) there is some evidence of a product defect; (2) comparative responsibility applies because there was evidence of negligence beyond the mere failure to discover or guard against a product defect; and (3) there is no evidence supporting the gross negligence finding. Accordingly, we reverse the court of appeals judgment and render judgment that the plaintiffs recover their actual damages reduced by the jury's finding of fifty percent comparative responsibility.