NUMBERS 13-99-549-CV AND 13-99-637-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI


___________________________________________________________________


IN RE: THE ESTATE OF 


ORPHY HARRY LONGUET, DECEASED


___________________________________________________________________


On appeal from the County Court at Law No. 1


of Victoria County, Texas.


____________________________________________________________________


O P I N I O N



Before Chief Justice Seerden and Justices Dorsey and

Rodriguez

Opinion by Chief Justice Seerden




 The issue in these consolidated appeals is whether Venita Longuet
("Venita") exercised undue influence over her husband, Orphy Harry
Longuet ("Harry"), in the execution of his 1997 will. In this will, Harry
left his entire estate to his wife, Venita, without naming any contingent
beneficiaries. When Venita offered Harry's 1997 will for probate,
Harry's niece, Glenda Adams, filed a will contest alleging that Venita
procured Harry's execution of the 1997 will through undue influence. 
Contending that the 1997 will was void, Glenda instead offered a copy
of Harry's 1994 will for probate.

 After trial, the jury found from a preponderance of the evidence
that Harry signed the 1997 will as the result of undue influence exerted
by Venita. The trial court entered judgment on this verdict, and severed
all matters pertaining to the 1997 will into a separate cause of action. 
Venita appealed this matter in Cause No. 13-99-549-CV. The trial court
thereafter entered judgment admitting a copy of Harry's 1994 will to
probate, and Venita appealed this judgment in Cause No. 13-99-637-CV. After consolidation of these appeals, we reverse, finding no
evidence of undue influence, and remand for the admission of Harry's
1997 will to probate.

Factual Background


 Harry and Venita married on May 15, 1997. Harry was ninety-one
years old, and had been widowed twice before. His last marriage, to
Peggy Moody Longuet, ended in January of 1996 when she passed
away. While married to Peggy, Harry executed the 1994 will, leaving
his property to Peggy, and listing his and Peggy's nieces and nephews
as contingent beneficiaries. Venita, seventy-five years of age, had also
been widowed twice before.

 Venita and Harry had been business acquaintances for some forty-five years before their courtship began. They began dating in October
or November of 1996, some ten or eleven months after the death of
Harry's previous wife, Peggy, and dated approximately six months
before their marriage in May of 1997, in Lockhart, Texas. Harry
executed the 1997 will in favor of Venita on May 22, 1997, one week
after their marriage. Harry died on June 21, 1998, a little more than one
year later.

Undue Influence


 After being instructed that undue influence means "the influence
or dominion by excessive importunities, imposition, or fraud, exercised
at the time of the making of a will, that destroys the testator's free
agency and overcomes his wishes in regard to the disposition of his
property to such an extent that the will does not in fact express his
wishes as to the disposition of his property, but rather expresses the
wishes of the person exercising the influence," the jury found that
Venita had exerted undue influence on Harry.

 In her first and second issues, Venita argues that there is no
evidence or insufficient evidence to support the jury's conclusion that
she exercised undue influence over Harry in the preparation and
execution of his 1997 will. In her third and fourth issues, Venita argues
that the trial court improperly permitted the introduction of irrelevant
testimony regarding the familial relationship, and the introduction of
this evidence prejudiced her in the eyes of the jury and resulting in an
unfavorable verdict.

Standard of Review


 In considering no evidence or legal sufficiency points of error, we
consider only the evidence and inferences from the evidence favorable
to the decision of the trier of fact, and disregard all evidence and
inferences to the contrary. See State Farm Fire & Cas. Co. v. Simmons,
963 S.W.2d 42, 44 (Tex. 1998); Burroughs Wellcome Co. v. Crye, 907
S.W.2d 497, 499 (Tex. 1995). If more than a scintilla of evidence
supports the challenged finding, the no evidence challenge must fail. 
See General Motors Corp. v. Sanchez, 997 S.W.2d 584, 588 (Tex.
1999); Mayberry v. Texas Dep't of Agric., 948 S.W.2d 312, 316
(Tex.App.--Austin 1997, pet. denied).

 In considering a factual sufficiency point, we may not substitute
our judgment for that of the trier of fact, but must assess all the
evidence and reverse for a new trial only if the challenged finding
shocks the conscience, clearly shows bias, or is so against the great
weight and preponderance of the evidence as to be manifestly unjust. 
See Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex.
1998); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

Applicable Law


 Influence is considered undue when the free agency of the
decedent is destroyed and a testament is produced that expresses the
will of the one exerting the influence rather than the decedent's true
wishes. Estate of Davis, 920 S.W.2d 463, 465 (Tex.App.--Amarillo
1996, writ denied). To prevail on a claim of undue influence, a will
contestant must establish: (1) the existence and exertion of an
influence; (2) the effective operation of such influence so as to subvert
or overpower the mind of the testator at the time of the execution of the
testament; and (3) the execution of a testament which the maker
thereof would not have executed but for such influence. Rothermel v.
Duncan, 369 S.W.2d 917, 922 (Tex. 1963). 

 Existence and Exertion of Influence


 The first prong of the Rothermel test requires the existence and
exertion of an influence. Rothermel, 369 S.W.2d at 919. The exertion
of undue influence may not be inferred by the mere opportunity to exert
influence. Id. at 922. Opportunity must be coupled with evidence that
an improper influence existed and that the influence was exercised at
the time the disputed will was executed. Smallwood v. Jones, 794
S.W.2d 114, 119 (Tex.App.--San Antonio 1990, no writ). 

 Under this element, we focus upon the relationship between the
person who executed the document, the contestant, and the party
accused of exerting undue influence. Id. at 923. In determining
whether undue influence was exerted, we assess "the opportunities
existing to exert the influence, the circumstances surrounding the
execution of the document, the existence of any fraudulent motive, and
whether the testator was habitually subjected to the control of the party
accused." Davis, 920 S.W.2d at 466. 

Effective Operation of Influence


 The contestant must also prove the effective operation of such
influence so as to subvert or overpower the mind of the testator at the
time of the execution of the testament. Rothermel, 369 S.W.2d at 919. 
This inquiry focuses upon the decedent's mental or physical capacity to
resist. Davis, 920 S.W.2d at 466-67. 



No Execution "But For" the Influence


 The third element of the Rothermel test asks if there was
execution of a document which the person would not have made but
for the alleged influence. Rothermel, 369 S.W.2d at 919; Cobb v.
Justice, 954 S.W.2d 162, 166 (Tex.App.--Waco 1997, pet. denied). 
Establishment of this element is generally predicated upon an
assessment of whether the testament provides for an unnatural
disposition of the property. Davis, 920 S.W.2d at 467.

Burden of Proof


 The burden of proving undue influence is upon the party
contesting the execution of the will. Rothermel, 369 S.W.2d at 922. It
is necessary for the contestant to introduce some tangible and
satisfactory proof of the existence of each of the above stated elements
of undue influence. Id. Further, it cannot be said that every influence
exerted by one person on the will of another is undue, for the influence
is not undue unless the free agency of the testator was destroyed, and
a testament produced that expresses the will of the one exerting the
influence. Id.

Evidence of Undue Influence


 A court should permit the introduction of all relevant evidence of
events before and after execution of the will, which tends to prove the
existence of undue influence at the time of execution. Watson v.
Dingler, 831 S.W.2d 834, 837 (Tex.App.--Houston [14th Dist.] 1992,
writ denied). Undue influence may be shown by direct or circumstantial
evidence, but will usually be established by the latter. Green v. Earnest,
840 S.W.2d 119, 121 (Tex.App.--El Paso 1992, writ denied). When
circumstantial evidence is relied on, the circumstances must be so
strong and convincing, and of such probative force, as to lead a well-guarded mind to a reasonable conclusion not only that undue influence
was exercised, but also that it controlled the will power of the testator
at the precise time the will was executed. Id. Circumstances relied on
as establishing the elements of undue influence must be of a reasonably
satisfactory and convincing character, and they must not be equally
consistent with the absence of the exercise of such influence. Mackie
v. McKenzie, 900 S.W.2d 445, 450 (Tex.App.--Texarkana 1995, writ
denied); Garza v. Garza, 390 S.W.2d 45, 47 (Tex.Civ.App.--San Antonio
1965, writ ref'd n.r.e.). This is so because a solemn testament
executed under the formalities required by law by one mentally capable
of executing it should not be set aside upon a bare suspicion of
wrongdoing. Garza, 390 S.W.2d at 47.

 Establishing the existence of undue influence generally involves
inquiry into factors such as the circumstances surrounding execution
of the instrument; the relationship between the testator and the
beneficiary and any others who might be expected recipients of the
testator's bounty; the motive, character, and conduct of the persons
benefitted by the instrument; the participation by the beneficiary in the
preparation or execution of the instrument; the words and acts of the
parties; the interest in and opportunity for the exercise of undue
influence; the physical and mental condition of the testator at the time
of the will's execution, including the extent to which he was dependent
upon and subject to the control of the beneficiary; and the improvidence
of the transaction by reason of unjust, unreasonable, or unnatural
disposition of the property. Mackie, 900 S.W.2d at 449; Green, 840
S.W.2d at 122. 

 Analysis


 An examination of the evidence and inferences that tend to
support the finding of undue influence reveals the following. Harry was
ninety-one years old and had been recently widowed. He suffered from
a number of ailments, and took numerous medications. Testimony
suggested that his physical, mental, and emotional condition was
deteriorating as he aged.

 The circumstances surrounding Harry and Venita's wedding were
unusual. Harry and Venita married in Lockhart without inviting any of
their friends or relatives. Although Venita told her family about the
wedding, neither Harry nor Venita told any of their friends or
acquaintances in Victoria about the marriage, and Harry did not tell his
family, who found out about the wedding some months later. Harry
executed the 1997 will in favor of Venita one week following the
wedding.

 Testimony revealed that Harry and Venita's marriage differed in
many respects from traditional notions about marriage. The couple
maintained separate residences, although there was testimony that
Harry planned to sell his home and belongings and move in with Venita,
putting his beloved dogs up for adoption. Venita did not know Harry's
religion, what medications he took, or the names of Harry's two dogs. 
Witnesses testified that they rarely saw Venita and Harry together, and
that Harry was usually found at home alone, whereas Venita
occasionally frequented the Forum Club. Although Harry had not
consumed alcoholic beverages for twenty-five years, Venita began
giving him bourbon and orange juice "for his bronchitis." 

 When Harry passed away on a trip, Venita failed to inform Harry's
family until some days afterwards, and failed to hold a memorial service
in his honor. Although Venita told Harry's family that she would bury
Harry in her family's cemetery plot, Venita instead had Harry cremated
and mailed his ashes in a box through the United States mail back to
his residence.

 The testimony adduced at trial showed that Harry had enjoyed a
warm and loving relationship with his family, including his brother and
his family, and relatives of his deceased wife, Peggy, before he began
his relationship with Venita. Harry's relationship with his family
deteriorated significantly following his marriage to Venita. Harry
accused one nephew of spying on him and attempting to kill him, and
suggested that a niece was harassing him. There was some evidence
of ill-feelings between Venita and Harry's family, and in fact, following
Harry's death, Venita told Glenda Adams, Harry's niece, that he had
never loved her.

 Considering all of the foregoing in the light most favorable to the
verdict, we conclude that there is less than a scintilla of evidence to
support the jury's finding of undue influence. Although Venita clearly
had the opportunity to exert undue influence on Harry, the evidence
fails to show that any such improper influence existed and that the
influence was exercised at the time the disputed will was executed. 
Smallwood, 794 S.W.2d at 119. On the contrary, John E. Dorris,
Harry's attorney, testified that all instructions pertaining to the will
came directly from Harry, and that Venita was not present during the
execution of the will. Moreover, although Harry was infirm, the
evidence showed that he understood the nature of his estate and his
beneficiaries. There was no testimony suggesting that Harry lacked the
mental or physical capacity to resist an exertion of undue influence. 
Davis, 920 S.W.2d at 466-67. Finally, the third element of the
Rothermel test asks if there was execution of a document which the
person would not have made but for the alleged influence. Rothermel,
369 S.W.2d at 919; Cobb, 954 S.W.2d at 166. Harry's 1997 will leaves
his estate to Venita, his wife, which is a natural disposition of his
property. Davis, 920 S.W.2d at 467. Moreover, we note that Harry's
1997 will resembles his previous will insofar as both documents
designate Harry's spouse as beneficiary; the only distinction between
the two wills is the elimination of contingent beneficiaries in the 1997
will.

 We sustain Venita's first issue. Because we have sustained this
issue, we need not address her remaining points of error. See Tex. R.
App. P. 47.1. 

 Conclusion


 Each claim of undue influence is different; thus, the evidence must
be reviewed on a case-by-case basis. See Rothermel, 369 S.W.2d at
921-22. Typically, the jurors are in the best position to sift through the
direct and circumstantial evidence presented concerning undue
influence. See Cobb, 954 S.W.2d at 166. However, in the instant case
we must conclude that the jury did not have before it probative
evidence tending to show undue influence. See id. Consequently, we
reverse the trial court's judgments in Cause Nos. 13-99-549-CV and 13-99-637-CV, and remand to the trial court for proceedings consistent
with this opinion.



 

 ROBERT J. SEERDEN, Chief Justice


Do not publish
.

Tex. R. App. P. 47.3.


Opinion delivered and filed

this 21st day of December, 2000.