BROWN & ROOT, INC., n/k/a Kellogg–Brown & Root, Inc., Appellant,

v.

Nancy MOORE, Individually and as Personal Representative of the Heirs and Estate of Robert Moore, Deceased, et al., Appellees.

No. 06–01–00148–CV.

Court of Appeals of Texas, Texarkana.

Submitted Nov. 7, 2002.

Decided Dec. 11, 2002.

David J. White, Godwin Gruber, PC, Dallas, for appellant.

Kirk L. Pittard, David C. Greenstone, Waters & Kraus, LLP, Dallas, for appellees.

Before GRANT and ROSS, JJ.

## OPINION

Opinion by Justice GRANT.

Brown & Root, Inc., n/k/a Kellogg–Brown & Root, Inc. appeals a jury verdict in favor of the Plaintiffs–Appellees, Nancy Moore, individually and as personal representative of the heirs and estate of Robert Moore, deceased, et al. (Moore). This was a suit for personal injury Robert Moore suffered as a result of his exposure to asbestos. The jury found that Brown & Root was ten percent responsible for Moore's injury and also found that Brown & Root acted with malice in proximately causing the injury. The trial court then rendered judgment against Brown & Root awarding $166,000 in exemplary damages. Brown & Root appeals the jury's finding of malice and, therefore, the exemplary damages awarded against them.

This case turns on whether there is any evidence to support the jury's finding of malice on the part of Brown & Root which resulted in the award of exemplary damages. Brown & Root contends that when an employer is a corporation, only the actions of the corporation's vice principals may be attributed to the corporation.

Robert Moore suffered from mesothelioma and eventually died from this illness January 7, 2001. Moore worked as a laborer at Lone Star Steel from 1977 to 1985. While working at Lone Star, Moore worked around tempering furnaces that allegedly contained asbestos insulation. Contractors from Brown & Root tore out and installed insulation in the furnaces and pipes at Lone Star. Moore asserted he worked in the vicinity of Brown & Root employees while they performed this tearout and reinstallation work on the furnaces.

Brown & Root contends there is no evidence supporting the jury's finding of malice and, therefore, the award of exemplary damages was improper. When reviewing a challenge to the factual sufficiency of an adverse finding of an issue on which it did not have the burden of proof, the attacking party must demonstrate on appeal there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In reviewing a no-evidence issue, we must consider all of the record evidence in the light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998).

A no-evidence point should be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules or law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997).

Brown & Root argues there is no evidence that Brown & Root, *the corporation*, acted with malice. Chapter 41 of the Texas Civil Practice & Remedies Code, which deals with exemplary damages, defines malice as

(7) "Malice" means:

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7)(B) (Vernon Supp.2003). This definition includes objective and subjective requirements. Objectively, the defendant's conduct must involve an extreme risk of harm, a threshold significantly higher than the objective reasonable person test for negligence. *Celanese Ltd. v. Chem. Waste Mgmt., Inc.*, 75 S.W.3d 593, 599 (Tex.App.-Texarkana 2002, pet. denied). Subjectively, the defendant must have actual awareness not just of a risk, but of an *extreme risk* created by the conduct. *Id.*

■■■ The objective prong of malice requires an "extreme degree of risk," which is not a remote possibility of injury or even a probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex.2001). The subjective prong requires "actual awareness," which means the defendant knew about the peril, but its acts or omissions demonstrated it did not care. *Id.* Additionally, circumstantial evidence is sufficient to prove either prong of malice. *Id.* Evidence of malice is legally sufficient if, considered as a whole in the light most favorable to the prevailing party, it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 595 (Tex.1999).

■■■ Brown & Root's contention concerning malice is that the appropriate officer of Brown & Root did not have malice. For a corporation to be held liable for exemplary damages, the acts or omissions of the corporation itself must have been committed with malice. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998). The Texas Supreme Court holds that a corporation has acted with malice and is liable for punitive damages if (1) the corporation itself commits the acts or omissions with malice; (2) the corporation authorized or ratified an agent's malicious acts or omissions; (3) the corporation is malicious in hiring an unfit agent; or (4) the corporation commits malice through the actions or inactions of a vice principal. *Id.* at 921–22. Vice principal encompasses: (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those in whom the master has confided the management of the whole or a department or a division of the business. *Id.* at 922.

The facts and the legal points raised on appeal in the present case closely resemble those in *Mobil Oil Corp. v. Ellender*; thus, the facts of *Ellender* are useful. *Id.* at 922–26. Mobil Oil was sued by Ellender for injuries sustained from continued exposure to benzene. *Id.* at 920. Ellender was a millwright at Mobil's refinery from 1963 to 1977; he was continually exposed to benzene at work. Ellender was diagnosed with leukemia and died in 1989. *Id.* Ellender alleged Mobil was negligent, grossly negligent, and malicious in: (1) failing to warn Ellender about his exposure to benzene on Mobil's premises and the risks associated with it, and (2) failing to protect Ellender from those risks. *Id.* The jury found Mobil's conduct was grossly negligent and malicious. *Id.* The Texas Supreme Court affirmed. *Id.*

Like Brown & Root in the present case, Mobil asserted there was no evidence to support the jury's verdict of malice. *Id.* Specifically, Mobil claimed there was insufficient evidence of "an extreme risk" to Ellender of serious injury from benzene exposure. *Id.* However, the court found there was evidence Mobil failed to warn contract workers about benzene exposure or protect them from it. *Id.* Moreover, from Mobil's own viewpoint, it was recognized during the time Ellender worked at Mobil there was an extreme degree of risk associated with benzene exposure. *Id.* There is also evidence Ellender's exposure to benzene was dangerously high. *Id.* at 923.

Mobil asserted there was no evidence a vice principal's conduct involved an extreme degree of risk to Ellender. *Id.* However, the Texas Supreme Court did not agree. The court found there was evidence of Mobil's *own* acts and omissions involved an extreme degree of risk. *Id.* Mobil had an "unwritten policy" not to monitor contract workers, and Mobil did not include any reference to benzene or other chemicals in its 1967 pamphlet titled "Mobil Safety and Security Regulations for Contract Workers." *Id.*

Mobil also argued there was insufficient evidence a Mobil vice principal knew of the extreme risk. *Id.* at 924. Mobil's medical director from 1960 to 1983 testified he knew benzene caused diseases, including aplastic anemia. *Id.* Additionally, samples from conditions similar to those in *Ellender* showed excessive levels of benzene exposure. *Id.* Mobil also had a program "designed to protect the health of those employees who handle benzene and benzene related products," that directed doctors and hygienists to look for benzene exposure and provide protective gear. *Id.* The Texas Supreme Court found that all of this constituted legally sufficient circum-

stantial evidence Mobil vice principals knew that not providing protective gear and not monitoring or warning workers about benzene exposure was an extreme risk to contract workers like Ellender. *Id.* at 924–25.

■ The present case is strikingly similar to *Ellender.* Brown & Root asserts that no vice principal was responsible for malice. As for the objective prong of malice, Moore produced evidence at trial it was common knowledge in the industry as far back as 1930 that asbestos products posed a serious health risk. There was evidence it was accepted in 1949 that asbestos could cause lung cancer, and asbestos was linked to mesothelioma in approximately 1960. Evidence was also produced indicating the Texas regulations passed in 1958 and 1972 OSHA regulations regarding asbestos exposure limits. In light of this evidence, it appears there is legally sufficient evidence that Brown & Root's conduct, viewed objectively from Brown & Root's point of view when Moore worked there, involved an extreme degree of risk to contract workers like Moore.

The subjective prong of malice is where Brown & Root focuses its argument. Brown & Root argues no vice principal acted with malice. However, Brown & Root asks this court to drastically change the requirements to find a corporation liable for malice. There are several ways a corporation can be held liable for malice, and only one of them requires action from a vice principal. In fact, the Texas Supreme Court clarified this, stating, "A corporation is liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent." *Ellender,* 968 S.W.2d at 921. The next sentence states, "A corporation is *also* liable if it commits gross negligence through the actions ... of a vice principal." *Id.* at 922 (emphasis add-

ed). Therefore, if a corporation ratifies or authorizes one of its agent's malicious acts or if an agent is malicious in hiring an unfit agent, there is no requirement of action or involvement of a vice principal. *Id.*

Moore produced evidence of Brown & Root's subjective knowledge of the hazards of asbestos. Brown & Root knew the OSHA regulations related to asbestos exposure and applied them, and Brown & Root distributed an office memorandum regarding the OSHA regulations. Five years after that memorandum, Brown & Root sampled the air at ten of its work sites for asbestos monitoring, but no monitoring of Lone Star Steel was done. The OSHA regulations required monitoring to begin six months after the regulations were passed in 1972, and there was evidence Brown & Root did not begin monitoring until 1976.

There was also evidence Brown & Root circulated an interoffice memorandum regarding air monitoring that noted the "enormous" cost for initiating such an examination program. Additionally, there was testimony from two witnesses that cost considerations may affect decisions related to safety. There was expert testimony that Brown & Root was in possession of sufficient information to be able to anticipate in 1977 that workers in industrial settings may be exposed to asbestos.

Moreover, Brown & Root regularly contracted with Exxon and was Exxon's largest contractor. In 1947, Exxon began requiring its workers to wear respirators to avoid asbestos exposure. Exxon also created a safety manual containing its rules regarding the control of asbestos dust and the requirement that its workers wear respirators. Exxon provided a copy of this safety manual to the supervisors of its contractors before each job. In every job that Brown & Root performed for Exxon

after 1947, Brown & Root was required to follow Exxon's safety rules to protect its workers from asbestos exposure. In addition to the safety manuals given to Brown & Root supervisors, there is evidence of supplemental conversations explaining the precautions that should be taken. If Brown & Root's employees failed to wear the required respirators, Exxon would shut down the job. This evidence concerning Brown & Root's relationship with Exxon is circumstantial evidence tending to establish Brown & Root's subjective knowledge of the dangers of asbestos.

Furthermore, Brown & Root's health, safety, and environmental manager, John Hodges, testified he had the most knowledge with respect to work performed by Brown & Root at Lone Star Steel in the 1960's, 1970's, and 1980's. Hodges was aware that in the 1960's and 1970's, some thermal insulation products that may have been used on pipes or furnaces contained asbestos. Hodges testified Brown & Root was aware of the OSHA requirements related to the asbestos exposure. Hodges also acknowledged Brown & Root had an obligation to perform its work in a safe manner and that included protecting other workers, such as Lone Star Steel workers who could have potentially been injured by Brown & Root's work. Finally, Hodges acknowledged that if Brown & Root installed or disturbed insulation at Lone Star and a Lone Star employee was injured because of the work, Brown & Root would be responsible.

There was also testimony from Steven Paul Sellers, who was an industrial hygiene technician for Brown & Root from November 1976 to April 1984. When Sellers was hired at Brown & Root in 1976, the position was new. As an industrial hygiene technician, Sellers performed a variety of functions, including air monitoring or air sampling. Sellers received on-the-

job training and went to a formal asbestos contractor course concerning the hazards of asbestos. Sellers testified he knew Brown & Root was involved in the removal of asbestos-containing materials around the country. Sellers further testified that between 1977 and 1984, it was proper for an industrial hygienist to assume that insulation already in place was asbestos-containing unless testing had been done to confirm otherwise. Sellers knew in 1977 that asbestos was a hazardous substance and that it was connected to some forms of cancer. Sellers stated that insulation removal required monitoring and application of OSHA regulations. Sellers testified he performed air monitoring related to asbestos on a variety of occasions, but there were many Brown & Root job sites that may have contained asbestos he was not able to cover.

Sellers further testified asbestos fibers can stay in the air for long periods of time and can float in a wide area. There was also testimony from Sellers recognizing that the inhalation of asbestos fibers is hazardous. Sellers acknowledged he would be concerned if he were to observe a tear-out of asbestos and see that no protective mechanisms were being used. Sellers admitted that a corporation's attitude could be described as indifferent if that corporation exposed its employees or others to hazardous substances despite knowledge of the hazard and an understanding of the regulations.

Testimony from former Brown & Root employees also established evidence of Brown & Root failing to protect the workers at Lone Star Steel. James Hubert Jones was an employee of Brown & Root and worked at Lone Star Steel from the 1970's to 1981; during that time, he worked as a millwright, the same position as Robert Moore. Jones testified he was never told about the dangers of asbestos or provided with any type of instructions on how to safely work with asbestos. Jones testified that to his knowledge, no air monitoring was ever done at Lone Star Steel. Moreover, Brown & Root did not teach Jones how to decrease dust while he was working at Lone Star Steel. Jones stated he was not provided with respiratory protection from Brown & Root when he was working around asbestos. Jones further testified Brown & Root did not put up any signs or rope off areas where there may have been asbestos. There was no medical monitoring performed on Jones for asbestos-related diseases. Finally, Jones testified that during his entire career working for Brown & Root, Brown & Root never taught him to use any type of precautions regarding asbestos.

Additionally, there was testimony from Harold Vaughn, an employee of Brown & Root from 1954 to 1987; during that time, he was a project manager on the job at Lone Star Steel from approximately 1972 to 1981. Vaughn was the "top man" or the highest ranking Brown & Root supervisor at Lone Star Steel from 1972 to 1981. Vaughn supervised anywhere from fifty to 450 Brown & Root employees at Lone Star Steel. Vaughn testified he knew in the 1960's asbestos could cause health problems.

Vaughn testified Brown & Root performed no air monitoring the entire time he worked there, and it never placed any warning signs around asbestos products at Lone Star Steel. Vaughn further testified he did nothing at the premises of Lone Star Steel to determine if there was asbestos present when he began working there in 1972. Vaughn did not know whether refractory castable or block insulation from the 1950's to the 1970's contained asbestos; these were the materials Brown & Root worked on at Lone Star Steel. Vaughn then explained he would not be

able to tell from any point in time at Lone Star Steel whether the insulation being removed contained asbestos.

Evidence exists regarding Brown & Root's subjective knowledge of the risks associated with asbestos and its failure to protect its employees and the workers at Lone Star Steel from those risks. Unlike the facts in *Louisiana–Pacific Corporation v. Andrade,* here, more evidence than a mere absence of corporate policy was raised. 19 S.W.3d 245, 248 (Tex.1999) (Andrade was told electricity was turned off, but when he leaned against a metal rail of a crane, he received an electric shock that caused permanent head injuries. There was no corporate policy regarding turning off the electricity, but under the circumstances that alone did not support an inference of Louisiana Pacific's subjective awareness.). Moreover, the Texas Supreme Court recognized that corporate policies or lack of them can serve as a basis for gross negligence or malice. *Id.* In *Mobil Oil Corporation v. Ellender,* the plaintiff produced evidence Mobil had a detailed policy of monitoring, testing, and warning its own employees to protect them from risks associated with exposure to benzene, but did not do so for contract workers. 968 S.W.2d at 924–25. The Texas Supreme Court concluded this policy was legally sufficient evidence Mobil knew of the extreme risks associated with benzene exposure, and despite this knowledge had an "unwritten practice or policy" of not warning or testing contract workers, which permitted the jury to infer Mobil knew of the risks of benzene exposure yet proceeded with conscious indifference toward the safety of the contract workers. *Id.*

Again, the facts in the present case mirror those in *Ellender. Id.* at 924–25. In *Ellender,* the Texas Supreme Court found that evidence of knowledge of a dangerous risk coupled with not providing protective gear or warning workers was legally sufficient evidence that the vice principals engaged in malice. *Id.* at 925. Here, similar evidence exists to support the jury's finding Brown & Root acted with malice. Brown & Root, when contracting with Exxon, proceeded with extreme caution and protected workers possibly coming in contact with asbestos; however, Brown & Root did not use these safety policies while working at Lone Star Steel.

The testimony from Brown & Root's health, safety, and environmental manager, Hodges, indicated he was in the position to know the most about potential asbestos-contaminated work sites, and he knew thermal insulation like that at Lone Star Steel could contain asbestos. There is further evidence that despite Brown & Root's knowledge that asbestos could likely be in the pipes and furnaces at Lone Star Steel, there was no monitoring or testing done to determine if in fact asbestos was present, nor were any precautions taken such as warnings or distributing protective gear.

The circumstantial evidence substantiates that Brown & Root vice principals knew of the risks concerning asbestos exposure, but still did nothing to warn or protect the workers at Lone Star Steel. Evidence was also introduced that Vaughn, who was the Brown & Root supervisor at Lone Star Steel, satisfies the requirements of a vice principal. Vaughn had the authority to direct Brown & Root employees at Lone Star Steel, and Brown & Root confided in him to manage the entire Brown & Root operation at Lone Star Steel. *See Hammerly Oaks v. Edwards,* 958 S.W.2d 387, 391 (Tex.1997). This evidence was sufficient for the jury to find malice on the part of Brown & Root through the actions of Vaughn, a vice principal. The jury could also have reasonably

inferred that Brown & Root, the corporation, acted with malice. Specifically, evidence was raised that Brown & Root had subjective knowledge of the risks associated with asbestos but acted with conscious indifference to the rights of the workers at Lone Star Steel.

Having reviewed the evidence in a light most favorable to the jury's finding to determine if Brown & Root had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, we find the evidence was legally sufficient to support the jury's finding of malice. Thus, Brown & Root's point of error is overruled.

The judgment of the trial court is affirmed.

Chief Justice MORRISS not participating.