No. 04-01-00160-CV



GENERAL MOTORS CORPORATION,


Appellant



v.



Rita L. IRACHETA, Administrator of the Estates of David Iracheta, Deceased, and Edgar

Iracheta, Deceased; John H. Russell, Administrator of the Estate of Silvandria Iracheta, Deceased 

Appellees



From the 49th Judicial District Court, Webb County, Texas


Trial Court No. 97-CVE-001382-D1


Honorable Manuel Flores, Judge Presiding



Opinion by: Karen Angelini, Justice


Sitting: Sarah B. Duncan, Justice

 Karen Angelini, Justice

 Sandee Bryan Marion, Justice


Delivered and Filed: May 31, 2002


AFFIRMED Rita L. Iracheta ("Iracheta") brought suit against General Motors Corporations ("GM"),
alleging that a design defect in the Toronado her two grandsons were riding in proximately caused
their deaths. A jury found a defect existed, which caused one child's death, and awarded Iracheta
$10,004,500.00 in actual damages and $750,000.00 in exemplary damages. GM appeals. We affirm
the trial court's judgment. 

Factual and Procedural History

 Silvandria Iracheta and her sons, Edgar and David, were traveling in a 1988 GM Toronado
on Highway 83 between Eagle Pass and Laredo, Texas. Silvandria crossed over into on-coming
traffic and collided with an eighteen-wheeler. The truck's fuel tank ruptured, splashing diesel fuel
over both vehicles. Silvandria was killed instantly.

 After the collision, the Toronado came to rest on a downward incline off the roadway. It was
on fire. Based on eyewitness accounts, a second fire erupted. Both Edgar and David died.

 Iracheta brought this products liability action against GM (1) on behalf of the estates of her
grandsons, David and Edgar. Iracheta claimed that the defectively designed fuel system of the GM
Toronado David and Edgar were riding in caused a post-collision fuel-fed fire, which burned David
and Edgar to death. (2) 

 Following trial, a jury found that a design defect in the Toronado's fuel system was the
producing cause of Edgar's death. The jury, however, found that David's death was not caused by
the defect and refused to find that the boys' mothers' negligence caused Edgar's injury. (3) The jury
awarded Edgar's estate $10,004,050.00 for conscious pain and suffering and found GM acted with
malice. GM stipulated to $750,000.00 in exemplary damages, based on the jury's malice finding. 

 GM filed a motion for judgment non obstante verdicto/motion to disregard jury answers. The
trial court overruled GM's motions and entered judgment in the amount of $10,004,050.00 in actual
damages, plus prejudgment interest, and $750,000.00 in exemplary damages. The trial court
overruled GM's motion to modify the judgment and alternative motions for new trial and remittitur.
GM raises nineteen issues on appeal: the evidence is insufficient to support the jury's findings;
whether a change in an expert's opinion without supplementation of or amendment to discovery
responses mandates exclusion of the testimony; whether compliance with federal safety standards
establishes an absence of malice as a matter of law; whether the trial court's instruction regarding
Silvandria Iracheta's negligence was error; whether Iracheta's speech to the jury constitutes incurable
jury argument and whether the lack of a record of that speech mandates a new trial; whether
Iracheta's use of peremptory strikes violated Batson; and whether the jury's $10 million award for
pain and suffering is manifestly unjust.

Sufficiency of the Evidence

 In multiple issues, GM challenges the sufficiency of the evidence supporting the jury's
findings. Specifically, GM maintains the evidence is legally and factually insufficient to support the
jury's finding that a design defect existed, that the defect caused Edgar's injuries, that Edgar
experienced conscious pain and suffering, and that GM acted with malice.


 Standard of Review


 In assessing whether the evidence supporting a jury finding is legally sufficient, this court
considers only the evidence favorable to the jury's decision and disregards all evidence and
inferences to the contrary. Davis v. City of San Antonio, 752 S.W.2d 518, 522 (Tex. 1988); Thrift
v. Hubbard, 974 S.W.2d 70, 77 (Tex. App. - San Antonio 1998, pet. denied). If there is more than
a scintilla of evidence to support the finding, then the no evidence challenge fails. Stafford v.
Stafford, 726 S.W.2d 14, 16 (Tex. 1987); Thrift, 974 S.W.2d at 77. In considering a challenge to the
evidence's factual sufficiency, this court reviews all of the evidence in a neutral light and reverses
for a new trial only if the challenged finding shocks the conscience, clearly demonstrates bias, or is
so against the great weight and preponderance of the evidence that it is manifestly unjust. Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986); Thrift, 974 S.W.2d at 77.


 Design Defect


 GM first attacks the legal and factual sufficiency of the evidence supporting the finding that
a design defect existed in the Toronado's fuel line. Specifically, GM makes the following
complaints: 1) there is no evidence the Toronado fuel system failed to withstand the crash, and 2)
Iracheta produced no evidence of a post-crash siphoning fuel-fed fire because Iracheta's fire expert
based his opinion on his incorrect understanding of another expert's opinion. (4)

 To establish a design defect, a plaintiff must prove that the design renders the product
unreasonably dangerous, taking into consideration the utility of the product and the risk involved in
its use, and that a safer alternative design exists which would substantially reduce the risk of injury
and be economically and technologically feasible. Tex. Civ. Prac. & Rem. Code Ann. § 82.005(a)
(Vernon 1997); General Motors Corp. v. Sanchez, 997 S.W.2d 584, 588 (Tex.1999); Restatement
(Second) of Torts § 402A (1965).

 1. Evidence of Failure

 GM complains there is no evidence that the Toronado's fuel system failed to withstand the
crash. According to GM, there is only surmise or speculation that the rear return line actually
ruptured and that the jury would have had to engage in impermissible inference stacking to make
such a finding.

 Iracheta presented two experts who testified regarding the failure of the return line: John
Stilson and Ed Sanchez. Stilson, a mechanical engineer, testified extensively about his theory of
defect in the fuel system. Stilson's opinions were based on his examination of the Iracheta's vehicle,
as well as tests conducted on an exemplar vehicle. Generally, Stilson believes gas siphoned out of
the forward portion of the return line. Sanchez, an arson investigator, was Iracheta's fire origin
expert. It is Sanchez's opinion, based on eyewitness testimony, that a fuel hose near the rear of the
vehicle separated on impact, allowing fuel to siphon from the car's fuel tank. Sanchez relied on
Stilson's opinion, as well as the fact that he ruled out other potential "holes" in the fuel system, (5) to
reach his conclusion. GM relies on this apparent conflict, as well as the fact that Sanchez is
unqualified to testify regarding where the fuel system failed, for its assertion that there is no evidence
that the Toronado's fuel system failed to withstand the crash. 

 First, we note that Sanchez was not qualified to render an opinion regarding where the
siphoning actually occurred. (6) Nothing in the record shows Sanchez's engineering opinion-that the
fuel line ruptured in the rear end of the car- is reliable. See E.I. du Pont de Nemours and Co., Inc.
v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995). In fact, Sanchez admitted he is not qualified to
render an engineering opinion. Accordingly, Sanchez's opinion that the crash caused an opening in
the rear portion of the fuel return line is little more than "subjective belief or unsupported
speculation" and amounts to no evidence. Robinson, 923 S.W.2d at 557. We, therefore, cannot
consider Sanchez's testimony regarding where the fuel system opened. 

 It is noteworthy that Sanchez opined that the fuel-fed fire ignited at the rear portion of the
vehicle. Stilson, however, testified that the front rubber hose of the Toronado's return line failed and
"that the [rear] fuel hose burned away rather than being compromised in the collision." It follows,
according to GM, that "there is no evidence of defect because the only expert qualified to give an
opinion on causation of siphoning denied that the rear fuel hose was compromised in the collision
- defeating the only theory of defect Plaintiff presented to the jury."

 Stilson's comments as a whole show that one explanation for a compromise of the rear hose
is that it burned away. Specifically, Stilson testified as follows:

 A: [The return line] opened both at the front line and the rear line. The hoses -
the steel lines remained, at least from the forward engine compartment rubber
hoses, the steel lines during the course of this collision remained totally intact
all the way back to the fuel tank. The only areas where I found that the lines
would have opened, and that's both the return and the feed but we'll talk
about the return line, is that the forward rubber hose and at the rear rubber
hose. So both of those areas opened up in the course of this entire event. That
meant that from the time of the collision till the time that this fire was
extinguished, both of those fuel lines opened up.


 Q: Okay. Did you make an initial determination of your own in this case as to
where the return line initially opened up?


 A: I did.


 Q: And what was your opinion?


 A: The forward rubber hose on the return line where it comes up in the front of
the dash panel from beneath the vehicle up to the engine connection, the steel
engine connection, that rubber hose section was - failed in some manner.
Now it's burned away on the subject vehicle.. . . 


 Q: Did you ever offer an opinion, Mr. Stilson, regarding what you think might
have caused the rear hose to open in this accident?


 A: Yes.


 Q: And what was your opinion, sir?


 A: My opinion was and is that one explanation for the opening of that rubber
hose was it was burned away by the fire. That's one explanation. Because it's
burned away right now. . . . 


 Q: Regardless of how this [system] opens up, do your opinions remain the same?


 A: My opinions are not dependent on where it opens up. My opinion is that this
system siphons if it opens up in the flexible hose areas, the forward and the
rear, regardless. It will siphon if you open up the steel areas. So I don't care
where it's opening up. Whether it's steel or whether it's rubber, once it opens
up, it's going to siphon and that's the defect. 

 Dr. Juan M. Herrera, a mechanical engineer, college professor and GM's engineering expert,
testified that rubber hoses can only break when they are pulled apart, not when they are compressed.
Here, according to Herrera, the hoses would have been compressed in the accident, not pulled apart,
and would not have ruptured.

 Summarily, we are left with Stilson's opinion that the front rubber hose of the return line
failed in some manner; Stilson's opinion that one explanation for a compromise in the rear hose is
that it burned away; and Herrera's opinion that the hoses did not rupture. Viewing this evidence in
the light most favorable to the jury's verdict, there is legally sufficient evidence to support a finding
that the Toronado's fuel system failed during the crash. And the jury's finding of a failure in the fuel
lines is not against the great weight and preponderance of the evidence. 

 2. Evidence of Fuel Siphoning and Fuel-Fed Fire

 GM also argues there is no evidence that fuel actually siphoned from the Iracheta vehicle
causing a fuel-fed fire. Stilson began his testimony by stating that in a 1988 Toronado "the tank
contents can siphon from this fuel tank and do siphon and will siphon resulting in what is called, first
of all, fuel fire, and secondly, fuel fed fire." Stilson testified that he believes gas siphoned out of an
open return line in this accident. The defect, according to Stilson "is that the tank siphons. The fact
is that the line opened up. Ed Sanchez has his opinion and I have mine, and they don't change the,
when the line opened, that the system siphons, and that's the defect." 

 Sanchez testified that the eyewitnesses' testimony regarding the second fire is consistent with
a fuel-fed fire resulting from fuel siphoning from the gas tank. Sanchez testified that the witnesses
told him"they heard the whoosh,  almost instantly they felt a warm sensation, they saw a violent
reaction, fire coming out of the underside of the vehicle." No witness suggested there was a grass
fire underneath the car or an engine fire. According to Sanchez, a violent reaction such as the one
described by eyewitnesses to the accident is a detonation of volatile vapors. The only flammable
material underneath the car was gasoline vapors, which ignited the fire. Sanchez testified that the fire
detonated at the rear of the vehicle.

 Problematically, Stilson theorized that the return lined opened near the front of the vehicle
as a result of the initial impact, but Sanchez determined that the fire detonated near the vehicle's rear.
Although this conflict may appear to be fatal to Iracheta's claim, Sanchez recognized that there might
be a conflict between his theory and Stilson's. Specifically, Sanchez stated: "But it could have been
either/or, it's immaterial, the gasoline is out of that environment, out of the contained fuel system.
Whether it did leak in the front or whether it leaked in the back is immaterial in my opinion." (7)

 GM counters that it "introduced evidence that there were no tests that showed the line would
open and siphon and no reports that such had ever happened." Richard Kirkpatrick, a former chair
of the GMC fuel system technical committee, testified that tests on the Toronado showed it did not
siphon under crash conditions and that there were no reports from the field that the Toronado fuel
system siphoned. Furthermore, GM presented pictures of a "crimp" in the front portion of the return
line. GM's expert theorized that the crimp precluded the return lines from siphoning. Herrera
testified that the crimp in the forward fuel lines effectively shut off the line to any possibility for
siphoning.

 Viewing this evidence in the most favorable light to the jury's verdict, we hold there is
sufficient evidence of siphoning to support the jury's finding. Viewing the evidence in a neutral light,
the evidence that the fuel system did not siphon is not so overwhelming to render the jury's verdict
a manifest injustice.


 Causation


 GM also argues there is legally and factually insufficient evidence to support the jury's
finding of injury and of causation of injury. Injury, according to the charge "refers to conscious
physical pain and emotional pain, torment and sufferingafter the whoosh, if any." Specifically,
GM maintains "[t]here is no evidence that 'but for' the fire associated with the claimed fuel
siphoning defect, Edgar would not have had conscious pain and suffering from burn injuries."
According to GM, the evidence shows Edgar suffered conscious pain before but not after the
whoosh. 

 To establish liability for a design defect, a plaintiff must prove that the defect was a
producing cause of his injury. Tex. Civ. Prac. & Rem. Code Ann. § 82.005(a)(2) (Vernon 1997).
A producing cause is "an efficient, exciting, or contributing cause, which in a natural sequence,
produced injuries or damages complained of, if any." Union Pump Co. v. Allbritton, 898 S.W.2d
773, 775 (Tex.1995); Rourke v. Garza, 530 S.W.2d 794, 801 (Tex.1975). Included within producing
cause is cause in fact, which means that the defendant's conduct must have been a substantial factor
in bringing about the injury and that the injury would not have occurred but for the defendant's
conduct. Allbritton, 898 S.W.2d at 775; General Motors Corp. v. Saenz, 873 S.W.2d 353, 357
(Tex.1993).

 1. Evidence Adduced at Trial

 GM contends there is no evidence to support a finding that "any defect in the 1988
Oldsmobile Toronado was a producing cause of injury to Edgar." Our inquiry must focus on whether
there is any evidence to support the jury's finding that Edgar experienced "conscious physical pain
and emotional pain, torment and suffering, if any,  after the whoosh," as defined in the charge.
Two eyewitnesses to the accident, Juan Barcena and Jose Villarreal, as well as the driver of the truck
involved in the accident, Grant Hellerman, testified at trial. (8) Two physicians also testified regarding
the pain and suffering Edgar may have suffered. 


 
 
 Jose Villarreal
 
 


 Jose Villarreal witnessed the accident and was the first rescuer to reach the Toronado.
According to Villarreal, after most of the smoke cleared, he could see a hand waving inside the car
as if someone was trying to put out flames. Although the grass around the car was burning, the
exterior of the car was not on fire. When Villarreal reached the car, he could see Edgar was alive and
had only a small cut on his forehead. Later, after the whoosh, Villarreal observed blisters develop
on Edgar's arm. Specifically, Iracheta's attorney asked Villarreal: 

 Q: The first time that you saw any fire blisters on Edgar Iracheta's body would
have been before or after the whoosh?


 A: It had to have been after I heard the whoosh because I was inside the car and
as I was backing out, that's when I saw the blisters on him.


 Q: And that was after the whoosh?


 A: Yes.


 Q: And are you saying the last sign that you had of Edgar as you were backing off was
his eyes making contact with you?


 A: Yes, sir. And I saw a big blister on his forehead.


 Q: So he was clearly still alive at that moment?


 A: Yes.


 Q: No doubt in your mind about that?


 A: Well, he was looking at me. (9)


 Villarreal had no memory of hearing screams from the compartment after the whoosh.
Villarreal believed he could have rescued the boys had the whoosh not occurred.

 b. Juan Barcena

 Juan Barcena and his wife were travelling behind the Iracheta vehicle and witnessed the
accident. Barcena attempted to render aid. Barcena testified that as he neared the Toronado, he could
hear voices, screaming, moaning, and pleading for help. Edgar was screaming for help and turned
to look at Barcena. According to Barcena, the grass surrounding the Toronado was on fire, and the
worst part of the fire was on the right side of the car's hood in front of Edgar on the other side of the
windshield. There was also fire in the front seat area, but wind from the back of the car was pushing
the fire away from Edgar. Even so, Barcena "could see the boy was very burned by then." Barcena
described Edgar's skin as swollen, to the point he could no longer tell what the child's gender was.
Also, Edgar's face and hair were singed. On cross examination, Barcena stated "[t]he boy was bad
by then, because when he would talk to me and ask for help, I could see that he would lose
consciousness. He would let his head roll forward, and in a minute or less than a minute he would
come to again." Barcena made clear that this all occurred before the explosion. Barcena testified that
had there been no explosion, he believed he could have rescued Edgar. 

 Barcena was deposed before trial. Portions of his deposition were read to the jury. In his
deposition, Barcena testified that, although he was not looking directly at Edgar when he heard the
whoosh, he knew the boy was still conscious because he could hear him.

 c. Grant Hellerman 

 Grant Hellerman was the driver of the truck involved in the accident. Hellerman approached
the vehicle and heard Edgar screaming, saying "help me, it hurts." Hellerman noticed the front end
of the car was burning and there was a small amount of fire underneath the dashboard but "it didn't
appear as though it was like on fire or anything." Hellerman testified that only Edgar's legs might
have been burned by this fire. However, a breeze was blowing flames from the front end of the car
up over the dashboard. Before the whoosh, Edgar's clothing was not on fire. Hellerman left the
Toronado to retrieve a fire extinguisher from his car. When he returned Edgar was unconscious.
After the whoosh, Hellerman never heard Edgar say another thing. 

 d. Dr. Joseph Burton

 Dr. Joseph Burton, a forensic pathologist, testified on Iracheta's behalf. First, he explained
his conclusions were based on a reasonable degree of medical probability. Because of the soot in
Edgar's airways and the carbon monoxide in his blood, as well as the absence of bodily trauma,
Burton concluded Edgar died from the fire. He further concluded that Edgar experienced a period
of pain and suffering before the whoosh, and a brief period of pain and suffering following the
whoosh. According to Burton, this briefer period lasted anywhere between fifteen seconds and two
minutes.

 GM contends Burton's testimony is based on assumptions not supported by the evidence and
is not based on reasonable medical probability. According to GM, Burton "clearly based his opinion
on the duration of pain and suffering on the fact he was told by Plaintiff's counsel that a witness
testified Edgar moved after the whoosh and continued to look about." GM contends there is no such
testimony that Edgar moved or looked about after the whoosh. However, Villarreal testified that
Edgar was alive and looking at him after the whoosh. Also, the following colloquy between Burton
and GM's trial counsel clarifies what Burton understood about the witness testimony: 

 Q: What witness did Mr. Lapin tell you, if any, saw either of these two boys
move or do anything after the collision? After the whoosh, I'm sorry. 


 A: Mr. Lapin told me their names, but I don't remember their names.


 Q: So Mr. Lapin told you that the testimony in this courtroom was that some
witness had testified that they saw these two boys moving after this whoosh?


 A: That they saw David move three times, make moans or groans or something
like that, they saw Edgar still sitting upright starring and looking about and
then watched blisters developing on Edgar's face. I believe that's what Mr.
Lapin related to me. 


Burton's comments are consistent with what the evidence shows-that Edgar looked at Villarreal after
the whoosh. Burton further based his testimony on an assumption that the whoosh arose because of
a design defect in the Toronado. There is evidence in the record to support that assumption. Burton's
testimony is additionally based on Edgar's autopsy, which indicated he suffered no other injuries,
and on eyewitness accounts of Edgar's behavior both before and after the whoosh. 

 Burton testified that when a person's face swells and his skin becomes transparent as a result
of fire, that person has suffered from either "deep second or third degree burns and they could
survive with those if nothing else happens after that potentially." There is pain and suffering
associated with burns of this magnitude. But, according to Burton, "when you get deep third degree
burns, the area where you have the deep third degree burns doesn't feel pain because the nerve
endings are burned away." 

 e. Dr. Vincent DiMaio

 Dr. Vincent DiMaio, the Chief Medical Examiner for Bexar County and a board certified
clinical, anatomical and forensic pathologist, performed the autopsy on Edgar. Based on Edgar's
autopsy, DiMaio concluded Edgar died of extensive burns and was "alive during some time of the
fire. Obviously, not throughout the whole fire." DiMaio concluded that Edgar was "dead prior to [the
whoosh] or so far gone, so close to death that he had no perception at all." Specifically, DiMaio
explained Edgar received his life threatening injuries before the whoosh

 [b]ecause there is no indication that he reacted to anything at the time or after or even
immediately before; that is, he didn't move, he didn't react, yet if this whoosh is
supposed to be very hot flames and very hot gases and there is no reaction, which
means he is either dead or in such a comatose condition that he is not feeling
anything. 

 DiMaio testified that "[i]t is not uncommon in fires like this for people to say they hear
moans, and then when we do the autopsies, there is absolutely no way the person was alive.And
what they are prescribing to moans are the fire, and it is the hot gases going through the frames of
the car, the broken metal frame." DiMaio also explained that with third-degree burns, the nerve
endings, or pain receptors, are burned away and the person will have no sensation. Vesicles or
blisters are associated with a second-degree burn. Objective signs of a third-degree burn include
swelling and a translucent appearance to the skin. DiMaio further opined that people die with their
eyes open and that it would be difficult to tell if someone were alive simply because that person's
eyes were open, particularly when the person had been dead for a very short time. 

 DiMaio admitted that he could not discern when, during the course of the fire, Edgar received
third-degree burns because there are too many variables, including the fact that the fourth-degree
burns have obscured everything. DiMaio's "timeline" is based solely on the witnesses testimony.
DiMaio conceded that even if Edgar had received third-degree burns over part of his body, he would
still be able to feel sensation and pain in the parts of his body that had not been burned to the same
degree. 

 DiMaio countered that "since there was no reaction, you have got three possibilities. One,
he had third-degree burns and didn't feel anything. Two, he was dead. Or three, he was almost to the
point of death." "No reaction" means to DiMaio, that Edgar was neither moving nor making sound. 

 f. Discussion

 Villarreal unqualifiedly testified that Edgar was alive and made eye contact with him after
the whoosh. And although most of Barcena's testimony deals with Edgar's condition before the
whoosh, Barcena testified that, after the whoosh, Edgar was conscious because Barcena could hear
him. However, Hellerman testified that before the whoosh, Edgar was unconscious and that he never
made another sound. Burton testified that Edgar suffered briefly following the whoosh, and DiMaio
believes Edgar was dead or so close to death that he could no longer feel any sensation. DiMaio did
acknowledge that Edgar would have sensation in those parts of his body that had not suffered third
degree burns. Viewing the evidence in a light favorable to the jury's verdict, the evidence is legally
sufficient to support the jury's findings that the "whoosh" caused injuries to Edgar. From the
evidence we can infer that Edgar was alive and conscious after the whoosh and that he suffered for
a brief time following the whoosh. Viewing all the evidence in a neutral light, the evidence is
factually sufficient. Even though there is evidence to suggest Edgar was unconscious before and after
the whoosh, that evidence is not so overwhelming so as to render the evidence supporting the jury's
verdict factually insufficient. Accordingly, there is sufficient evidence to support the jury's damages
award.

 GM makes a distinction between evidence of being alive and evidence of being conscious.
GM claims that Villarreal's testimony that Edgar was alive after the whoosh and Barcena's testimony
that he could hear Edgar after the whoosh is "not evidence of conscious reaction to pain." Conscious
pain and suffering may be proved by circumstantial evidence. Landreth v. Reed, 570 S.W.2d 486,
492 (Tex. Civ. App.-Texarkana 1978, no writ.). GM is correct in pointing out that "[t]he only pain
for which there can be a recovery is that which the child consciously experienced, and events that
occurred subsequent to a merciful unconsciousness did not prolong nor increase the suffering and
are not compensable." Russell v. Ramirez, 949 S.W.2d 480, 491 (Tex. App.-Houston [14th Dist.]
1997, no pet.) (citing Canales v. Bank of California, 316 S.W.2d 314, 318019 (Tex. Civ.
App.-Eastland 1958, writ ref'd n.r.e.)). Here, there is circumstantial evidence-Edgar looked at one
witness and another witness heard Edgar after the whoosh-that Edgar was alive and reacting to the
flames. This evidence gives rise to a reasonable inference that Edgar was conscious. 

 3. Lost Chance

 GM finally contends that Texas does not recognize a cause of action based on the doctrine
of "lost chance," which, according to GM, is one of Iracheta's "main causation theories." GM bases
this assertion on Iracheta's evidence suggesting that had the whoosh not occurred, Edgar could have
been rescued. Iracheta points out she did not plead "lost chance" and that the doctrine is not
appropriate for this type of case. 

 First, Iracheta's pleadings allege GM is strictly liable for Edgar's death because a design
defect in the Toronado was the producing cause of his death. Iracheta also pleads GM was negligent
by failing to include a proper fuel shut off valve or other anti-siphoning device in the Toronado's fuel
system, allowing gasoline to siphon from the fuel tank and by failing to recall the Toronado to install
an anti-siphoning device. Iracheta did not plead lost chance. 

 Second, in Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397 (Tex.1993), the Texas
Supreme Court held that Texas does not recognize a common law cause of action for lost chance of
survival in a medical malpractice case. There is no liability for negligent medical treatment "that
decreases a patient's chance of avoiding death or other medical conditions in cases where the adverse
result probably would have occurred anyway." Id. at 398. Both cases GM relies on are medical
malpractice cases.

 Malice


 The jury found that the harm Edgar suffered resulted from GM's malice. GM argues there
is no evidence to support the jury's finding. Alternatively, GM claims that because the Toronado met
or exceeded federal safety and integrity standards, exemplary damages against GM cannot be
maintained. 

 1. Evidence of Malice

 Exemplary damages, in common law tort actions, may be awarded when the plaintiff has
proven malice by clear and convincing evidence. Tex. Civ. Prac. & Rem. Code Ann.§ 41.003(a)(2)
(Vernon 1997). Malice, as defined for the jury here, is:

 [A]n act or omission by General Motors

 (i) which, when viewed objectively from the standpoint of General
Motors at the time of its occurrence involves an extreme degree of
risk, considering the probability and magnitude of the potential harm
to others; and


 (ii) of which General Motors had actual, subjective awareness of the risk
involved, but nevertheless proceeded with conscious indifference to
the rights, safety, or welfare of others.


Id. §41.001(7). 

 The definition of malice consists of both an objective and subjective prong. Wal-Mart Stores,
Inc. v. Alexander, 868 S.W.2d 322, 325-26 (Tex. 1993). Objectively, the defendant's conduct must
involve an extreme risk of harm. Id. at 326. The extreme risk prong is satisfied only by evidence
showing "'the likelihood of serious injury' to the plaintiff." Transportation Ins. Co. v. Moriel, 879
S.W.2d 10, 22 (Tex. 1994)(quoting Alexander, 868 S.W.2d at 327). Subjectively, the defendant must
have actual awareness of the extreme risk created by the conduct. Id. More specifically, there must
be "proof that the defendant knew about the danger, but its acts or omissions demonstrate that it did
not care." General Motors Corp. v. Sanchez, 997 S.W.2d 584, 596 (Tex. 1999). An act or omission
that is merely thoughtless or careless is not enough; the actor must proceed with actual conscious
indifference to the risk. Moriel, 879 S.W.2d at 20. The defendant's subjective mental state may be
proven by direct or circumstantial evidence. Id. One of the main factors supporting an award of
punitive damages is the fact that a manufacturer is aware of design changes that would have made
the product safer. Sanchez, 997 S.W.2d at 597.

 GM claims that, objectively, "[t]here is no evidence in this case that General Motors' conduct
was so extreme as to create the 'likelihood of serious injury.'" GM's expert, Richard Kirkpatrick,
agreed that siphoning from the fuel tank is very dangerous and poses a significant risk of harm to the
automobile passenger. Kirkpatrick stated that siphoning from a fuel tank is an "undesirable"
condition and admitted that GM was well aware of that fact years before it made the 1988 Toronado.
See Sanchez, 997 S.W.2d at 596. Kirkpatrick also testified that no tests revealed to GM that the
Toronado fuel system would siphon under crash conditions and there had been no field reports of
that particular system siphoning.

 Iracheta's experts were able to siphon fuel from the tank of the exemplar Toronado when it
was positioned at the same angle as the Iracheta's vehicle following the crash. Thomas Green, a
mechanical engineer who testified on Iracheta's behalf, stated that GM knew since the 1960s that
siphoning could occur. Iracheta introduced a patent issued to GM in 1966. The patent was issued to
prevent siphoning during "the use of automotive vehicles in that if a car is parked on a hill facing
down the incline and the engine is stopped, the fuel supply line is apt to act as a siphon and continue
the flow of fuel from the supply tank to the engine possibly to flood the intake manifold and the
combustion chambers and cause liquid fuel to leak into the crank case." And in 1973, GM filed
with the National Highway Traffic Safety Administration a report which indicated that "the fuel line
accumulator welch plug may become dislodged allowing the fuel to siphon from the fuel tank onto
the surface under the car when the engine is not running." The report dealt with 685,434 Pontiacs,
which, according to GM, were defective and in need of repair. 

 This evidence is sufficient to support the objective prong of the test for malice. GM knew
that siphoning posed a serious risk to automobile passengers. Kirkpatrick admitted that fact. We can
infer that GM would not have requested a patent to close a fuel line and prevent siphoning or issued
a recall of certain cars to repair a siphoning defect had GM not believed siphoning caused an extreme
risk of injury. 

 GM also claims there is no evidence of the subjective component of a malice finding because
there is no evidence that it "knew of a defect and chose not to implement a design change."
Specifically, GM argues Iracheta presented no evidence of "even one other 1986-1989 'E' car
(similar to the Toronado) involved in a post-collision fuel-fed fire as a result of siphoning from the
return line" and "no evidence that GM knew in 1988, when the vehicle was manufactured, that the
Toronado would siphon in any condition, including a head-on collision at highway speed."

 Iracheta introduced minutes from a July, 1986 meeting of the GM Fuel System Technical
Communications Committee. One issue addressed at the meeting was "Fuel Return Anti-Siphon."
A notation under that subheading provides "GM10 management continues to insist that an anti-siphon feature is required in the fuel sender return line." The committee minutes reflect that the
committee determined that "[s]ince there are no known field incidents of such occurrence nor any
evidence that it can even occur on other models, the Committee objects to the GM10 position."
GM10 refers to a specific car platform within General Motors. Cars made on that platform are
generally referred to as a "W" car. Thomas Green agreed that "for the purposes of the hazard that
we're talking about in this case the E car and the W or the GM10 have fuel systems that are
substantially similar." Green then went on to detail the similarities. Eventually, according to Green,
GM installed a siphon break hole on the fuel return line of W cars. The E cars-Toronados-received
the same modification in 1990. 

 GM documentation reflects that, a little over a week following the meeting discussed above, 

GM knew about the potential for siphoning fuel. Specifically, that documentation provides:

 The potential for siphoning fuel from the tank via the fuel feed and the fuel return
lines on the GM10 has been recognized since 1984. The subject has been the topic
of discussion in the fuel systems PDT (10) meetings (which are attended by ACSP) since
early 1985. The PDT feels strongly that the anti-siphon must be available for
SOP (11) 1988.


 The solution for the return pipe is to either add two .110 inch diameter holes to the
pipe directly under the cover to break the siphon or to add a "duck bill" type of one
way flow device.


 It is uncontroverted that an anti-siphon break hole and a duck bill valve are cost effective and
would eliminate any risk of fuel siphoning. 

 Based on Green's testimony that the fuel systems of the "E" and "W" cars are "substantially
similar" and the fact the GM clearly knew that "W" cars would siphon, reasonable minds could
differ about whether GM knew the "E" car would also siphon. The parties do not dispute the fact that
no anti-siphon device was placed on the 1988 Toronado. This evidence satisfies the subjective prong
necessary to a malice finding. Accordingly, the evidence is legally and factually sufficient to support
the jury's finding that Edgar's injuries resulted from GM's malice.

 2. Federal Standards

 GM argues that "Iracheta's exemplary damages claim cannot be maintained against GM
because there is undisputed evidence that the Toronado met and/or exceeded the requirement of
FMVSS 301, which relates to fuel system integrity and requires that a vehicle withstand a 30 mph
impact with fuel leakage not to exceed one ounce a minute after rollover." GM cites several cases,
many from outside Texas, to support its position. However, none of the cases GM cites categorically
supports GM's assertion. First, GM cites Miles v. Ford Motor Co., 922 S.W.2d 572, n.7 (Tex.
App.-Texarkana 1996), rev'd on other grounds, 967 S.W.2d 377 (Tex. 1998). In Miles, the court
of appeals recognized that most commentators suggest that compliance with a safety standard should
bar liability for punitive damages. The court, however, refused to decide that issue in the case.
Instead, the court held that the evidence was insufficient to support the jury's malice finding. GM
also cites Brand v. Mazda Motor Corp., 978 F. Supp. 1382 (D. Kan. 1997). In that case, the court
stated "compliance with federal regulatory standards 'is not dispositive under Kansas law if a
reasonable manufacturer would have done more.' Nor does compliance with federal regulatory
standards cut off liability for punitive damages when the plaintiff is able to prove by clear and
convincing evidence that the manufacturer still acted with 'reckless indifference to consumer
safety.'" Id. at 1393. The court went on to affirm the summary judgment because there was no
evidence of a safer alternative occupant protection system than the one used by Mazda. Id. at 1385.
Similarly, in Welch v. General Motors Corp., 949 F. Supp. 843, 845 (N.D. Ga. 1996), the court held
that in Georgia, punitive damages are not precluded, notwithstanding evidence of compliance with
safety standards, if there is other evidence showing culpable behavior. 

 These cases do not support the notion that when a manufacturer complies with safety
standards, a plaintiff is completely foreclosed from exemplary damages against the manufacturer,
should the jury find it was negligent. Rather the cases suggest that whether a manufacturer complied
with federal safety guidelines is one factor courts should consider to determine whether the
manufacturer acted with malice. We therefore decline to adopt GM's argument that a plaintiff is
categorically precluded from recovering damages from a manufacturer for a defectively designed
product when the product meets or exceeds federal safety standards. 



Change of Expert Opinion GM next contends the trial court should have struck Sanchez's testimony. In his deposition,
Sanchez testified first that, with regard to where siphoning occurred on the vehicle, he could not be
any more specific than "the fuel lines between the tank and the area where they come into the engine
compartment where they connect to the flex lines at both ends, somewhere between point A and
point B." However, he also testified "Personally I feel that it is from the back end simply because
the detonation occurred underneath the vehicle at the back end." At trial, Sanchez testified that he
believed the rear portion of the return line was compromised.

 GM maintains the trial court abused its discretion in failing to strike his testimony in light
of the discrepancies between his deposition and trial testimony. Tex. R. Civ. P. 193.6, 195.6;
Aluminum Co. of America v. Bullock, 870 S.W.2d 2, 4 (Tex. 1994). We review a trial court's ruling
on a motion to strike for an abuse of discretion. Guaranty Fed. Savs. Bank v. Horseshoe Operating
Co., 793 S.W.2d 652, 657 (Tex. 1990). Sanchez's statements were not wholly inconsistent.
Accordingly, the trial court did not abuse its discretion in refusing to grant GM's motion to strike
Sanchez's testimony. 

 Regardless of the alleged inconsistencies, GM has waived this issue. A party opposing the
admission of evidence must specifically object at the time it is offered to lay a predicate for appellate
review of the trial court's action. Tex. R. App. P. 33.1; Miles v. Ford Motor Co., 922 S.W.2d 572,
591 (Tex. App.-Texarkana 1996), rev'd in part on other grounds, 967 S.W.2d 377 (Tex. 1998). An
objection made after the evidence has been admitted is too late. Id.

 Sanchez's direct testimony covers 94 pages in the reporter's record. At no time during
Sanchez's direct testimony did GM move to strike his opinions. GM's counsel cross-examined
Sanchez for an additional 114 pages. GM objected to Sanchez's testimony and moved to strike him
as a witness once it completed its cross examination of him. GM contends that it was only at this
point that it realized Sanchez's opinions had materially changed, and therefore presented its
objections to the trial court. However, early in its cross examination of Sanchez, GM questioned him
about the changes in his testimony. Throughout the remainder of its cross examination, GM pointed
out to Sanchez and the jury what it perceived to be discrepancies between his trial testimony and his
deposition. Accordingly, GM cannot contend that it did not know about Sanchez's change in
testimony until the end of cross-examination. GM's objection was untimely and its issue is waived.

Charge Error

 GM asserts the submission of jury question number 3 "precluded a proper comparison of
injury causing conduct and injury enhancing conduct." (12) GM further argues the instruction was a
comment on the case as a whole because it focused the jury's attention on whether Silvandria caused
Edgar's injuries after the whoosh. We hold GM has not properly preserved this argument for our
review. 

 When an instruction included in the trial court's charge to the jury is defective, the
complaining party must make a timely and specific objection pointing out the matter complained of
and the ground of the objection. Tex. R. Civ. P. 274; Spencer v. Eagle Star Ins. Co., 876 S.W.2d
154, 157 (Tex.1994); City of Houston v. Kolb, 982 S.W.2d 949, 955 (Tex. App.-Houston [14th
Dist.] 1999, pet. denied). On appeal, a party must make the same objection to the charge that was
made in the trial court or any error is waived. City of Brady v. Bennie, 735 S.W.2d 275, 285 (Tex.
App.-Eastland 1987, no writ); Texaco, Inc. v. Pennzoil Co., 729 S.W.2d 768, 819 (Tex.
App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.).

 The question and instruction as presented to the jury is:


 Did the negligence, if any, of Silvandria Iracheta proximately cause the injury in
question to Edgar Iracheta?


 "The injury in question" refers to conscious physical pain and
emotional pain, torment and suffering, if any experienced by Edgar
after the whoosh, if any?


 At the charge conference, GM raised the following objections. 


 Number 3, jury question number 3, Your Honor. The court will - our
objections are as follows:I will object to the submission of this issue because it is
unnecessary.


 The second part - the second objection that I have to question number 3 is
that there is no evidence to submit - to support the submission of the issue with
respect to an injury in question as defined by the Court. And third, Your Honor, the
definition as stated of injury in question is a comment upon the weight of the
evidence.

 GM's objections made during the charge conference are not the same as the issues GM raises
regarding jury question number 3 on appeal. Accordingly, any error in the question and instruction
is waived.

Sylvandria Iracheta's Negligence GM contends the jury's failure to find Silvandria Iracheta negligent is against the great
weight and preponderance of the evidence. According to GM, Silvandria proximately caused the
crash and resulting injury to Edgar. Iracheta agrees with GM's assertion that Silvandria was
negligent. However, she points out that in the jury question inquiring whether Silvandria's
negligence proximately caused Edgar's injuries, "injury in question" was defined as: "conscious
physical pain and emotional pain, torment and suffering, if any, experienced by Edgar after the
whoosh, if any." Proximate cause was defined as: 

 that cause which, in a natural and continuous sequence, produces an event, and
without which cause such event would not have occurred. In order to be a proximate
cause, the act or omission complained of must be such that a person using ordinary
care would have foreseen that the event, or some similar event, might reasonably
result therefrom. There may be more than one proximate cause of an event.


 For GM's claim to have merit, we must assume that if a driver can foresee a crash she
necessarily must foresee all the consequences that may follow from her car's product design defects.
This court cannot make that assumption without usurping the jury's role as factfinder. The jury found
GM responsible for all damages to Edgar after the whoosh. That finding is supported by the record.

Jury Argument GM raises on appeal three issues related to improper jury argument: 1) that Iracheta's speech,
in Spanish, to the jury constituted a plea for racial solidarity; 2) the lack of a record of the speech
amounts to reversible error; and 3) Iracheta's counsel's argument regarding other fuel-fed fires
violated the trial court's ruling on a motion in limine.


 Was Iracheta's Speech Incurable Jury Argument? 


 During closing argument, Iracheta spoke to the jury in Spanish. The statement was neither
translated nor recorded in writing. However, the trial judge noted that Iracheta was "specifically
thanking [the jury] for their service." A tape recording of Iracheta's speech was made. The Official
Court Interpreter for the 49th Judicial District Court in Webb County interpreted her statement to
say: "Thank you very much to the jury on the part of my grandchildren and my daughter and on my
part."

 GM alleges that "[c]ounsel's intentional solicitation of Ms. Iracheta's Spanish-language
statement to the all-Hispanic jury, although perhaps clever, was an impermissible suggestion to the
jury that it should feel ethnic solidarity with Ms. Iracheta." GM also maintains that the lack of a
record of the statement constitutes reversible error. GM made no objection to Iracheta's speech.
Therefore, any claim GM may have regarding Iracheta's speech is waived. And even if Iracheta's
speech was racially motivated, there is nothing in the record to show that the jury was influenced by
her comments. See Tex. R. App. P. 44.1(a)(1); Texas Employers' Ins. Ass'n v. Haywood, 266 S.W.2d
856, 858 (Tex. 1954) (reciting "true test for incurability"); Texas Employers' Ins. Ass'n v. Guerrero,
800 S.W.2d 859, 865 (Tex. App.-San Antonio 1990, writ denied) (appellant must show probability
that improper argument caused harm is greater than probability that verdict based upon proper
proceedings and evidence). 


 Lack of Record of Speech 


 GM also maintains that because no translator was present when Iracheta made her speech and
because the court reporter was unable to transcribe her statements, this court is unable to assess the
impropriety of Iracheta's statements to the jury. GM, therefore, argues it is entitled to a new trial.
GM failed to object to the lack of an interpreter or of a recording of Iracheta's speech.

 GM argues that it did not waive its complaint regarding the lack of a translator at trial
because Iracheta bore the burden of requesting an interpreter. GM cites Texas Code of Criminal
Procedure, article 38.30 as support for its assertion. The Code of Criminal Procedure does not place
the burden of requesting an interpreter on the non-English-speaking party. Rather, either party or the
court may move for appointment of an interpreter. Tex. Code Crim. Proc. Ann. art. 38.30(a)
(Vernon Supp. 2002). Even if the Code of Criminal Procedure did place the onus of requesting an
interpreter on the non-English-speaking party, we must presume that the Texas Supreme Court
purposefully left a similar provision out of the Rules of Civil Procedure. Accordingly, GM should
have requested an interpreter or objected to the lack of one in order to preserve error. See Tex. R.
App. P. 33.1(a)(1). 

 GM further argues that because "Iracheta's statement was not - and could not be - recorded
by the court reporter, there can be no appellate review of the impropriety of her statement; therefore,
this Court should reverse and remand for a new trial." GM's complaint is similar to one where a
party claims a record of trial proceedings was somehow lost or destroyed. Texas Rule of Appellate
Procedure 34.6(f) provides:

 An appellant is entitled to a new trial under the following circumstances:


 (1) if the appellant has timely requested a reporter's record;


 (2) if, without the appellant's fault, a significant exhibit or a significant
portion of the court reporter's notes and records has been lost or destroyed


 (3) if the lost, destroyed or inaudible portion of the reporter's record, or the
lost or destroyed exhibit, is necessary to the appeal's resolution; and


 (4) if the parties cannot agree on a complete reporter's record."


 Here, GM neither objected to the reporter's inability to record Iracheta's statement nor
requested that the reporter record the statement. And further, even though Iracheta's statement was
not recorded at the moment she spoke, the trial judge noted on the record that she was thanking the
jury for their service, and the official interpreter filed an interpretation of the statement with the trial
court. Accordingly, the content of Iracheta's statement is before us, allowing this court to review
the propriety of the statement. GM has made no showing that her speech was harmful. Issac v. State,
989 S.W.2d 754, 757 (Tex. Crim. App. 1999) ("necessary to the appeal's resolution" language is
itself harm analysis"). Accordingly, GM is not entitled to a new trial based on the lack of a record
of Iracheta's Spanish statements to the jury. Lascurain v. Crowley, 917 S.W.2d 341, 344-45 (Tex.
App.-El Paso 1996, no writ) (where witness testifies in absence of reporter and appellant fails to
object, appellant not entitled to a new trial). 


 Improper Jury Argument Regarding Other Accidents 


 GM also contends that Iracheta's counsel, in an attempt to explain GM's use of anti-siphoning devices on its fuel systems, improperly argued to the jury that "between 1988 and 1990
there were people that started to burn to death and people that started to get hurt and killed." GM
asserts this statement was a violation of the trial court's ruling on GM's motion in limine and that
the argument injected new and harmful facts without establishing the proper predicate.

 At trial, GM objected to the argument, stating "I object. Counsel is not allowed to speculate.
He can only argue the evidence and the evidence that's presented. There's been no evidence
presented of that speculation."GM's objection was insufficient to preserve any complaint that
Iracheta violated the motion in limine. See Weidner v. Sanchez, 14 S.W.3d 353, 364-64 (Tex.
App.-Houston [14th Dist.] 2000, no pet.); Davis v. Stallones, 750 S.W.2d 235, 237 (Tex.
App.-Houston [1st Dist.] 1987, no writ)(unless proper, timely objection is made when an improper
question has been asked in violation of motion in limine, error is waived).

 GM's objection was sufficient to give the trial court notice of its complaint that the evidence
did not support Iracheta's counsel's argument. Yet to obtain reversal of a judgment on the grounds
of improper jury argument, GM must prove: (1) an error; (2) that was not invited or provoked; (3)
that was preserved at trial; and (4) was not curable by an instruction, a prompt withdrawal of the
statement, or a reprimand by the trial court. Standard Fire Ins. Co. v. Reese, 584 S.W.2d 835, 839
(Tex. 1979). Essentially, GM must prove that the probability the improper argument caused harm
is greater than the probability that the verdict was based upon the proceedings and the evidence.
Texas Employers' Ins. Ass'n v. Guerrero, 800 S.W.2d 859, 865 (Tex. App.-San Antonio 1990, writ
denied). 

 The record does not support Iracheta's counsel's statements. Thus, the statement was error.
There is nothing in the record, nor does Iracheta contend, that the error was invited or provoked. The
error, however, was not preserved. After GM objected to the statement, the trial court did not
expressly rule on the objection. Tex. R. App. P. 33.1(a)(2). Rather, the trial court instructed the jury
that "what the lawyers tell you now is not evidence. It is argument. They are allowed to draw
reasonable inferences from the evidence that was presented, but you are the ultimate triers of
fact."Assuming the error was preserved and the trial court's instruction was not strong enough to
cure the error, GM has not shown that the one statement in closing argument changed the outcome
of the trial. Thus, the error is harmless. 

Batson/Edmonson GM complains that Iracheta's use of her peremptory strikes violated Batson v. Kentucky. In
Batson v. Kentucky, the United States Supreme Court declared that racially motivated use of
peremptory challenges in criminal cases violates due process of law and requires reversal. 476 U.S.
79 (1986). In Edmonson v. Leesville Concrete Co., Inc., the Court extended the reach of Batson to
civil trials. 500 U.S. 614, 630-31 (1991). Resolution of a Batson/Edmonson challenge involves a
three-step process: (1) the opponent of the peremptory challenge must establish a prima facie case
of racial discrimination; (2) the party who exercised the strike must provide a race-neutral
explanation; and (3) if the striking party does so, the party challenging the strike must prove
purposeful racial discrimination. Purkett v. Elem, 514 U.S. 765, 767 (1995); Goode v. Shoukfeh, 943
S.W.2d 441, 445 (Tex.1997). The issue of whether a race-neutral explanation should be believed is
a question of fact for the trial court. Goode, 943 S.W.2d at 446. We review the trial court's
determination for an abuse of discretion. Id. at 491. 

 GM maintains that Iracheta's race-neutral explanations for striking venire persons 7 and 9
were pretextual and did not disprove her discriminatory exercise of her peremptory strikes. 

A. Venire Person 7

 GM objected to Iracheta's use of a peremptory strike on venire person 7, claiming she was
stricken for ethnic reasons. Iracheta's trial counsel testified that they struck venire person 7 because:
1) she writes for a periodical; 2) she is extremely opinionated; 3) her answers to questions were
nonresponsive; 4) as a former college professor "she leads the thought of the people in the room;"
and 5) she has worked with metals in the past. 

 GM argues that each of Iracheta's reasons are pretextual because there were other venire
persons with characteristics similar to venire person 7's who were not stricken from the panel and
because Iracheta's reasons are not supported in the record. For example, venire person 7 possessed
knowledge of metallic melting points. GM contends that five other jurors had extensive experience
with diesel or automotive fuel systems and were, nevertheless, retained on the jury. Although each
of these panel members may have some experience with or knowledge of fuel systems, that
knowledge or experience is not "extensive." (13) GM also argues that two other panel members were
educators, but were not stricken from the panel and that Iracheta never asked venire person 7 about
her opinions. However, Iracheta's counsel testified that he knew venire person 7 was opinionated
because he has read her newspaper column for several years. 

 Based on the reasons offered by Iracheta's counsel, we hold the trial court did not abuse its
discretion in determining Iracheta's reasons for striking venire person 7 were race-neutral. 

B. Venire Person 9 

 GM also objected to Iracheta's use of a peremptory strike on venire person 9. Iracheta,
however, argues that she struck venire person 9 because she is related, by marriage, to a member of
one of the firms involved in the case, and that the firm took care of a land transaction venire person
9 was involved in. Furthermore, Iracheta's counsel had known venire person 9 for years, was in the
same fraternity as her son, and knew her other son, who had been killed in a car accident. He further
testified that he struck venire person 9 because he "did not want to put her through that kind of thing,
reliving that situation." The trial court did not abuse its discretion in determining Iracheta's reasons
for striking venire person 9 were race-neutral. 

Conclusion We hold there is sufficient evidence to support the jury's finding that a design defect existed
in the fuel system of GM Toronado Edgar Iracheta was riding in. Furthermore, the evidence is
sufficient that the defect caused a fuel-fed fire, which caused Edgar to suffer conscious pain and
suffering and that the damages Edgar suffered were a result of GM's malice. In addition, we hold 

that none of the remaining errors alleged in GM's brief amounts to reversible error. Accordingly, we
affirm the trial court's judgment.


 Karen Angelini, Justice


Publish
1. Iracheta also sued Hamm's Discount Tire Service d/b/a Hamm's Quality Retail Center. Iracheta nonsuited
Hamm's before trial.
2. Iracheta's theory regarding the design defect in the Toronado's fuel system, as stated in her pleadings, is as
follows:

 The Toronado was defective and unreasonably dangerous for lack of a proper fuel shut-off valve or
other anti-siphoning device which lack allowed the gasoline to siphon and cause the ensuing fire on
the occasion in question. The defective design of the Toronado was a producing cause of the Minor
Decedents' deaths and the damages to Plaintiffs. Moreover, there existed a safer alternative design at
the time the Toronado left GM's control.
3. It is undisputed that Silvandria Iracheta, the boys' mother, caused the crash.
4. GM briefly asserts that because the circumstances under which the fuel system failed were so unusual or
extreme and not reasonably foreseeable, Iracheta's crashworthiness claim must fail. According to GM, "a head-on
collision with both vehicles traveling 60 mph is an extreme circumstance which a fuel system cannot be held to be
unreasonably dangerous if it did not withstand such."

 "Foreseeability of risk of harm is a requirement for liability for a defectively designed product; a product need
not be designed to reduce or avoid unforeseeable risks of harm." Hernandez v. Tokai Corp., 2 S.W.3d 251, 257 (Tex.
1999) (applying foreseeability consideration to misuse of product). "[A] product that is safe for its intended use is not
defectively designed merely because it is unsafe in other circumstances." Id. (analyzing whether product intended for
adults only was defective when child was injured while playing with product). 

 A collision such as the one in this case may be extreme, but it certainly is not unforeseeable. In fact, Richard
Kirkpatrick, a former GM employee, admitted that high-speed collisions occur on highways every day. When asked
whether "General Motors knew about that, that was foreseeable and understandable to General Motors," Kirkpatrick
responded "Yes, sir." 

 


5. Specifically, Sanchez testified:



 the fuel tank did not rupture;
 the metal lines, connected to the rubber hoses, were not broken or severed;
 the vapor line did not siphon because the line is not in the fluid itself;
 the fuel feed line did not siphon because it has a valve, which prevents siphoning;
 Stilson agreed with Sanchez that neither the fuel fed line, the vapor line, nor the feed line
allowed fuel to siphon;
 even if the filler neck was ruptured or dislodged, the amount of vapors that would have been
released would have been insignificant;
 no boil over effect (heat applied to gas tank causing fuel to boil out of the tank) because the
tank was exposed only to a rapid flash fire immediately upon impact. Sanchez cannot confirm
the grass was burning underneath the car, constantly heating the gas tank, because no witness
testified to that fact;
 the fire was not caused by diesel fuel splashed from the impact, because most of it spilled
onto the road and onto the Iracheta's vehicle. Diesel requires extremely high and consistent
temperatures to ignite and stay burning. Diesel had nothing to do with the "whoosh," but
could have accelerated the fire that erupted after the "whoosh;"
 siphoning is consistent with the eyewitness testimony.



 According to Sanchez, after all other possibilities have been removed, the only remaining avenue for fuel to
siphon from the tank was the return line at the rubber hose connection. Sanchez explained that upon impact, the rear hose
was shoved back toward the rear of the car from the front, causing the hose to dislodge.
6. Iracheta claims that GM did not object to Sanchez's qualifications or the reliability of his testimony. To the
contrary, at a pretrial hearing, GM filed a motion to exclude Sanchez's testimony. GM specifically characterized its
motion as a "straight-forward Robinson type motion" and presented the motion under Rule of Evidence 702, Robinson,
and Gammil. GM first argued Sanchez was unqualified to testify in his area of professed expertise - fire. Also, GM
asserts that Sanchez is to testify on how the vehicle siphoned. Specifically, GM argued:


 Finally, he's giving opinions that the vehicle siphoned, and I think this is very important, Your Honor.
He talks about the vehicle siphoning and how the vehicle siphoned. And if the Court will look there,
he has no experience in automotive design, never worked for an auto manufacturer. When asked if
an anti-siphoning device would prevent a fuel fed-fire - this is their theory. He was asked that question
- he said he would have to defer to an automotive engineer. He's a fire expert. 


Any claimed error is preserved. Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 409-10 (Tex. 1998) ("To preserve
a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial
or when the evidence is offered").
7. These statements were read to the jury from Sanchez's deposition.
8. Villarreal and Grant Hellerman testified at trial by video deposition.
9. Portions of Villarreal's deposition were read into the record during Dr. Vincent DiMaio's testimony. In his
deposition, Villarreal recounted the accident and concluded the Edgar was alive after the whoosh.
10. "Product Development Team."
11. "Start of Production."
12. GM raises the same complaint with regard to question number 4, which inquired if the negligence of
Silvandria Iracheta was a proximate cause of the injury in question to David Iracheta. Because the jury found GM was
not liable for David's injuries, and because Iracheta does not appeal the adverse judgment rendered against her for
David's injuries, we limit our discussion of GM's issue to the submission of question number 3.
13. Panel member #3 worked at a diesel truck stop and observed trucks refueling. Member #5 is an auto mechanic
who never worked on fuel systems or fuel lines. He did , however, replace filters on gasoline tanks. He was also familiar
with the differences between carbureted and non-carbureted cars. Panel member 17 knows that on forklifts, hoses are
connected from the fuel tank to the carburetor. He was also familiar with feed and return lines and knew of at least one
occasion where a rubber hose broke and leaked gasoline. Member #29 indicated that he had siphoned fuel from a gas
tank before, but that he had no other experience with fuel systems or fuel lines.