NO. 12-01-00183-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


JOHNSON CONTROLS
§
 APPEAL FROM THE 114TH

BATTERY GROUP, INC.,

APPELLANT

V.
§
 JUDICIAL DISTRICT COURT OF


JOSEPH RUNNELS,

APPELLEE
§
 SMITH COUNTY, TEXAS

 

MEMORANDUM OPINION DENYING REHEARING


 Johnson Controls Battery Group, Inc. ("Johnson Controls") has filed a motion for rehearing,
which is hereby denied. The opinion of February 28, 2003 is hereby withdrawn and the following
opinion is substituted in its place.

 Johnson Controls appeals the trial court's judgment rendered in favor of Joseph Runnels
("Runnels"), who sustained injury when his car battery, manufactured by Johnson Controls,
exploded. Johnson Controls raises four issues on appeal. We affirm.


Background

 Runnels was traveling via bus to Bossier City, Louisiana where his wife planned to meet him
at the bus station. The two planned to drive the rest of the way to Tyler, Texas in Runnels's wife's
car. After his wife's car failed to start properly, Runnels took a taxi from the bus station to the hotel
where his wife and her car were located. Runnels arrived at the hotel early on the morning of July
11, 1998, immediately retrieved his spare keys from his suitcase, and attempted to start the car. 
When the car failed to start, Runnels raised the hood to inspect the battery. As he reached for the
battery cable, the battery exploded. Runnels has no memory of any events surrounding the
explosion. The battery (the "Runnels battery") had been installed in Runnels's wife's car only
twenty months prior to the explosion.

 Runnels sued Johnson Controls and others under theories of strict liability/design defect,
strict liability/manufacturing defect, breach of express warranty, breach of implied warranty, malice
and negligence to recover for personal injuries he sustained as a result of the explosion. At trial,
Runnels argued that dangerous grid plate growth inside the battery (1) caused a short that ignited the
gases within the battery resulting in the explosion that injured him. 

 Dean Jacobson ("Jacobson"), Runnels's expert and a mechanical engineer, testified that,
using a microprobe, he had examined five separate minuscule (2) portions of the plates within the
Runnels battery. Jacobson further testified that the alloy selenium serves, in part, (3) to prevent
excessive grid plate growth in the battery plate. He also testified that the element selenium was not
detectable at all in four of the five tests he performed. (4) Moreover, Jacobson testified that excessive
grid plate growth led to an internal spark in the battery causing it to explode. Jacobson concluded
that the battery was defective and unreasonably dangerous.

 Edward Mrotek ("Mrotek"), a principal engineer in the product design group at Johnson
Controls testified that the Runnels battery was "well-maintained." Mrotek acknowledged that
ninety-five percent of Johnson Controls batteries lasted longer than the Runnels battery. He also
testified that the Runnels battery "did not meet the standard." Further, Mrotek confirmed that the
alloy selenium helps to curtail grid plate growth. 

 Ultimately, the jury returned a verdict in favor of Johnson Controls on theories of strict
liability/design defect, breach of express warranty and malice, but against Johnson Controls on
theories of strict liability/manufacturing defect, breach of implied warranty and negligence. The jury
awarded Runnels past damages in the amount of $530,000, and future damages in the amount of
$470,000. 

 Johnson Controls moved for judgment notwithstanding the verdict arguing that, while the
verdict was based on the finding of a manufacturing defect in the battery, there was no evidence that
the subject battery deviated from the manufacturer's specifications in any way. The trial court
overruled Johnson Controls's motion and rendered judgment on the verdict for Runnels on March
20, 2001. Johnson Controls subsequently filed a motion for new trial which was overruled by
operation of law.


Manufacturing Defect

 In its first issue, Johnson Controls argues that there was no evidence to support the jury's
finding that a manufacturing defect existed in the battery in question. In reviewing a "no evidence"
point, we must consider only the evidence and inferences that tend to support the jury's verdict,
disregarding all contrary evidence and inferences. See Wal-Mart Stores, Inc. v. Gonzalez, 968
S.W.2d 934, 936 (Tex. 1998). We may only sustain a "no evidence" point when the record discloses
one of the following: (1) there is a complete absence of evidence of a vital fact, (2) the court is barred
by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3)
the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (4) the
evidence establishes conclusively the opposite of a vital fact. See Merrell Dow Pharm., Inc. v.
Havner, 953 S.W.2d 706, 711 (Tex. 1997). It is not within our power to second-guess the fact-finder
unless only one inference can be drawn from the evidence. See State v. $11,014.00, 820 S.W.2d
783, 785 (Tex. 1991). If there is more than a scintilla of evidence to support the finding, the
evidence is legally sufficient. See Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex.
1993). On the other hand, when evaluating a factual sufficiency challenge, we will consider and
weigh all of the evidence in the case, both evidence supporting the verdict and evidence which tends
to contradict the facts upon which the jury based its verdict. See In re King's Estate, 244 S.W.2d
660, 661 (Tex. 1951). We may not substitute our conclusions for those found by the jury and will
reverse only if we conclude that the verdict is so against the great weight and preponderance of the
evidence as to be manifestly unjust. Id.

Admissibility of Expert Testimony

 In response to Johnson Controls's first issue, Runnels contends that there is direct evidence
that supports its manufacturing defect claim. One source of direct evidence noted by Runnels is the
testimony offered by Jacobson. In its second issue, Johnson Controls argues that the trial court
improperly admitted Jacobson's testimony. As our resolution of this portion (5) of Johnson Controls's
first issue is aided by our resolution of its second issue, the second issue will be addressed first.

 The standard for reviewing the trial court's admission of expert testimony is abuse of
discretion. See Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001). A trial court abuses
its discretion when it acts without reference to any guiding rules and principles or acts in an arbitrary
or unreasonable manner. See Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42
(Tex. 1985).

 If scientific, technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a witness qualified as an expert by
knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or
otherwise. Tex. R. Evid. 702. In light of the increased use of expert witnesses and the likely
prejudicial impact of their testimony, the proponent of scientific expert testimony must demonstrate
that such evidence is relevant and reliable before it can be admitted. See Gammill v. Jack Williams
Chevrolet, Inc., 972 S.W.2d 713, 720 (Tex. 1998); E.I. du Pont de Nemours and Co. v. Robinson,
923 S.W.2d 549, 556 (Tex. 1995). Scientific evidence which is not grounded in the methods and
procedures of science is no more than subjective belief or unsupported speculation. Gammill, 972
S.W.2d at 720. Unreliable evidence is of no assistance to the trier of fact and is therefore
inadmissible under Rule 702. Id. There are many factors that a trial court may consider in making
the threshold determination of reliability including, but not limited to (1) the extent to which the
theory has been or can be tested, (2) the extent to which the technique relies upon the subjective
interpretation of the expert, (3) whether the theory has been subjected to peer review and/or
publication, (4) the technique's potential rate of error, (5) whether the underlying theory or technique
has been generally accepted as valid by the relevant scientific community, and (6) the non-judicial
uses which have been made of the theory or technique. Id. (citing Robinson, 923 S.W.2d at 556-57). 
The trial court's role is to make the initial determination whether the expert's opinion is relevant and
whether the methods and research upon which it is based are reliable. See Robinson, 923 S.W.2d
at 557.

Relevance

 Johnson Controls argues that its specifications relate to the bulk alloy from which the plate
is cast, and that testing only a small portion of the plate as it existed in the final product is not
indicative of the composition of the bulk alloy. (6) However, as Runnels notes, the jury was instructed
that "a plaintiff has a manufacturing defect claim when a finished product (automobile battery)
deviates . . . from the specifications or planned output." See American Tobacco Co. v. Grinnell,
951 S.W.2d 420, 434 (Tex. 1997) (emphasis added). Jacobson testified that when a bulk alloy is
cast, the quantities of materials therein are not distributed evenly and do not exist in uniform
proportions to one another throughout the plate. Relevant expert testimony must be "sufficiently tied
to the facts of the case [so] that it will aid the jury in resolving a factual dispute." Id. at 558-59.

 Both Jacobson and Mrotek testified that selenium helps to curtail excessive grid plate growth. 
It follows that if selenium is not present in a portion of the grid plate after it is cast due to uneven
distribution, then it does not matter whether the proper quantities of selenium existed in the bulk
alloy, as any portion of the finished product that is lacking in selenium can potentially be subject to
excessive grid plate growth, despite sufficient quantities of the element elsewhere in the plate. As
such, we conclude that the specifications for bulk alloy are not relevant because they have no bearing
on the distribution of selenium throughout the finished product. Just as the jury was ultimately
instructed to focus its attention on the finished product, Jacobson, as well, properly focused his
examination on the finished product. (7) Therefore, we conclude that analysis of the composition of
the finished product was sufficiently tied to the facts of the case so that it would aid the jury in
resolving a factual dispute, and was, thus, relevant.

Reliability

 We next turn our analysis to the question of scientific reliability. In so doing, we examine
the facts of the instant case in light of the factors set forth in Robinson, 923 S.W.2d at 556-57.

The Extent to Which the Theory Has Been or Can Be Tested

 Jacobson testified that microprobe analysis is standard methodology for analyzing the types
and percentage of elements in a structure. He further testified that microprobes have been used for
years to analyze lead samples and batteries and that it is one of the few tools that can measure the
composition of various particles. Moreover, Jacobson testified that the microprobe is used
specifically to obtain scientific information upon which a metallurgist can base an opinion about
presence and distribution of alloys in a substance and that it is particularly useful for analyzing the
structure of a manufactured product. Finally, Jacobson testified that use of the microprobe for the
purpose for which he used it had been tested and had been determined to be reliable science. 
Johnson Controls argues that (1) Jacobson did not attempt to determine if the Johnson Controls
specifications were met at the time of manufacture, (2) the area sampled by Jacobson was extremely
small, (3) a series of tests Jacobson performed had to be disregarded because the detection limit on
the microprobe was set too high, and (4) although four of the five tests upon which Jacobson's
conclusion was based detected no selenium whatsoever, the fifth test detected more than forty times
the amount of selenium specified. However, none of Johnson Controls contentions address the
extent to which the theory has been or can be tested.

The Extent to Which the Technique Relies Upon the Subjective Interpretation of the Expert

 Jacobson testified that the microprobe is a device that produces scientific readings which are
not derived by subjective interpretation and that the only interpretation necessary is (1) the operator's
decision concerning where to set the "detection limit" and (2) from where within a structure the
samples are taken. The detection limit for the five tests on which Runnels relies was derived from
information provided by Johnson Controls. However, the location on the plate from which each
sample was taken was determined solely by Jacobson. Given the minute area to be tested, it follows
that five tests allow a very small look at the overall surface area of the battery. However, the trial
court examined Jacobson extensively on this question. Even though he based his conclusion on only
five tests, Jacobson testified as follows:


 [I]t is good science because you can look at a cross-section of a sample, and you can see the various
areas that you have. You have grain boundaries. You'll have precipitates, and you can look through
the grain boundaries and you'll see the same things everywhere. The central grain structure will be
the same everywhere.


 So you can go in and pinpoint the various areas. You don't have to do many, many multiples of those
areas. You'll get the same answers. I've been doing this for decades, and this is what you normally
do.



Whether the Theory Has Been Subjected to Peer Review and/or Publication

 In its brief, Johnson Controls's sole contention with regard to the peer review/publication
factor is that Jacobson testified that he knew of no published literature advocating his methodology
for testing a bulk sample of an alloy for its constituents. Irrespective of whether such a statement
accurately recounts Jacobson's testimony, (8) as set forth above, testing of a bulk or homogeneous
sample, rather than a finished product, is not relevant. On this point, Jacobson testified that "there
are hundreds, if not thousands, of papers that have been published by people all over the world who
use microprobes in exactly the same way that [Jacobson] did[,]" and that he "could bring [the court]
a stack of papers as high as [it wanted] in regard to the utilization; [and] also textbooks." 
Specifically, Jacobson directed the trial court to "The Metals Handbook," which he referred to as
"the bible of material science," and testified that it had entire chapters on the utilization of
microprobes.

The Technique's Potential Rate of Error

 In its brief, Johnson Controls argues that (1) Jacobson did not attempt to compare his post-manufacture microprobe results with results from any other battery, (2) Jacobson admitted that the
chemical elements for which he was testing would normally segregate in the granular structure so
that the location he was testing would not be expected to include all of the elements in the
specification, (3) corrosion of the alloy led to the migration of various elements, and (4) there was
no evidence that Jacobson's tests would show the condition of the alloy when it left the control
Johnson Controls. Jacobson testified that the relative error rate in microprobe analysis is one-tenth
of one percent.

Whether the Underlying Theory or Technique Has Been Generally Accepted as Valid by the Relevant
Scientific Community

 Johnson Controls's argument on this point focuses entirely on use of a microprobe with
respect to bulk alloy rather than finished product. However, with respect to a finished product,
Jacobson set forth that microprobe use is "standard methodology" in metallurgy, has been the subject
of hundreds, if not thousands, of publications, has been addressed in textbooks, and has several
chapters dedicated to it in a metallurgical reference book that Jacobson referred to as "the bible of
material science." Jacobson testified that microprobe analysis is used throughout the field to obtain
information on which an expert can base a scientific opinion exactly as he did in the present case.

The Non-Judicial Uses Which Have Been Made of the Theory or Technique

 Again, Johnson Controls focuses on the microprobe's potential use for the testing of bulk
alloys. Clearly, microprobe analysis can be used in aid of litigation, as it was in the case at hand. 
However, as Runnels notes, Jacobson testified the technique has also been included in textbooks,
as well as "The Metals Handbook," and is commonly used in industry.

 Our review of the record indicates that, considered in light of the criteria set forth in
Robinson, the expert testimony offered by Jacobson was reliable. Of the seven Robinson factors,
six weighed heavily in favor of the admissibility of Jacobson's testimony. Even considering the fact
that microprobe analysis is somewhat subjective inasmuch as Jacobson determined which areas to
test, the record indicates that Jacobson tested various zones of the grid and stated that it was not
necessary to conduct multiple tests in the same areas as the results would not differ. Based on our
review of the record, we are satisfied that in admitting Jacobson's testimony, the trial court did not
act without reference to guiding rules and principles nor did it act in an arbitrary or unreasonable
manner. Therefore, we hold that the trial court did not abuse its discretion in admitting Jacobson's
testimony. Johnson Controls's second issue is overruled.


Evidentiary Sufficiency


 One who sells any product in a defective condition unreasonably dangerous to the user or
consumer or to his property is subject to liability for physical harm thereby caused to the ultimate
user or consumer or to his property if (a) the seller is engaged in the business of selling such a
product, and (b) it is expected to and does reach the user or consumer without substantial change in
the condition in which it is sold. See Grinnell, 951 S.W.2d at 426 (citing Restatement (Second)
of Torts § 402A (1965)). A product may be unreasonably dangerous because of a defect in
marketing, design or manufacturing. See Caterpillar, Inc. v. Shears, 911 S.W.2d 379, 382 (Tex.
1995). A plaintiff has a manufacturing defect claim when a finished product deviates, in terms of
its construction or quality, from the specifications or planned output in a manner that renders it
unreasonably dangerous. Grinnell, 951 S.W.2d at 434.

 The record in the instant case indicates that a car battery delivers an electrical charge of
approximately twelve volts to start the car in which it is installed and is also used to supply electrical
power to accessories in the car, such as the headlights, for the battery's useable life. The Runnels
battery exploded after no more than twenty months of use. Mrotek testified that ninety-five percent
of Johnson Controls batteries lasted longer than the Runnels battery. Mrotek specifically noted that
the Runnels battery "did not meet the standard." Moreover, Mrotek testified that the batteries are
designed to be handled, cleaned of corrosion, installed in the vehicle by tightening the battery cables,
and held in place. Both Mrotek and Jacobson testified that the alloy selenium helps to curtail
excessive grid plate growth. Jacobson further testified that the element selenium was not detectable
at all in four of the five tests he performed on the Runnels battery. Moreover, Jacobson testified that
excessive grid plate growth led to an internal spark in the Runnels battery causing it to explode. 
Jacobson concluded that the Runnels battery was defective and unreasonably dangerous. 

 From such evidence, we conclude that the jury reasonably could have concluded that Johnson
Controls had a standard regarding the expected productive life span of its batteries. Moreover, the
jury could have reasonably concluded that the battery was unreasonably dangerous considering
Mrotek's testimony that batteries are designed to be handled under normal use and considering
Jacobson's testimony that the battery was unreasonably dangerous due to the fact that it exploded
and injured Runnels. Further still, even though the record reflects that other alloys, such as arsenic,
also serve to curtail excessive grid growth, the jury could have reasonably determined that the
absence of selenium caused the excessive grid growth in question. Considering only the evidence
and inferences that tend to support the jury's verdict, and disregarding all contrary evidence and
inferences, we hold that there was sufficient evidence to permit the jury to find that a manufacturing
defect existed in the battery in question. 

 In its brief, Johnson Controls also sets forth the standard of review for factual sufficiency. 
However, Johnson Controls does not specifically pursue such an argument. Nonetheless, we have
reviewed the record in its entirety, considering and weighing all of the evidence therein. We iterate
that we may not substitute our conclusions for those found by the jury unless we conclude that the
verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. 
See In re King's Estate, 244 S.W.2d at 661. Johnson Controls has not cited to any such evidence,
nor have we, based on our review of the record as a whole, uncovered any great weight and
preponderance of evidence that causes us to conclude that the verdict is manifestly unjust. We
further hold that the evidence was factually sufficient to support the jury's verdict. Johnson
Controls's first issue is overruled.


Breach of Implied Warranty/Negligence

 In its third issue, Johnson Controls raises a "no evidence" challenge to the jury's finding on
Runnels's breach of implied warranty claim. In Johnson Controls's fourth issue, it raises a "no
evidence" challenge to the jury's finding on Runnels's negligence claim. The jury's damages award
was conditioned on its affirmative liability finding related to Runnels's design defect, manufacturing
defect, breach of implied warranty or negligence claims. As we have concluded that the evidence
was sufficient to support the jury's finding on Runnels's manufacturing defect claim, we need not
address Johnson Controls issues related to Runnels's remaining claims. See, e.g., General Motors
Corp. v. Sanchez, 997 S.W.2d 584, 592 (Tex. 1999); Tex. R. Civ. P. 277.


Conclusion

 For the reasons set forth above, we hold that the trial court did not abuse its discretion in
admitting Jacobson's testimony. We further hold that the direct evidence was both legally and
factually sufficient to support the jury's verdict. As such, we need not consider Johnson Controls
third and fourth issues.

 Accordingly, we affirm the judgment of the trial court.


 SAM GRIFFITH 

 Justice

Opinion delivered May 21, 2003.

Panel consisted of Worthen, C.J., Griffith, J., and Ramey, Retired Chief Justice, Twelfth Court of Appeals, Tyler, sitting
by assignment.


































(PUBLISH)
1. Simply put, a 12-volt car battery is composed of six couplings of alloy plates resting in a sulfuric acid
solution. Each plate coupling includes a positive and a negative plate, which produces approximately two volts of
electricity. Under ordinary circumstances, the battery plates undergo a certain amount of growth.
2. The size of the portion of the battery examined by each microprobe analysis was likened to an area
approximately one hundred seventy times smaller than the tip of a paperclip wire.
3. The record reflects that selenium also serves to provides structural integrity to the grid plate structure.
4. Selenium was detected in excessive quantities in one of the five tests.
5. In its brief, Johnson Controls addressed Runnels's direct and circumstantial evidence separately. Here we
have initially focused on direct evidence. As we ultimately determine the evidence to be sufficient, we do not reach
the issue of sufficiency of circumstantial evidence.
6. Johnson Controls has specifications for composition of bulk alloy, but no such specifications for the
composition of the plates as cast in the finished product.
7. In addressing the Robinson criteria, Johnson Controls often reiterates its argument related to testing the
finished product versus the testing of bulk alloy. In the interest of brevity, our conclusion with regard to such an
argument will not be recycled below in every instance in which Johnson Controls raised it.
8. When questioned about publications regarding testing of bulk or homogeneous alloy samples, Jacobson
testified that he did not have any such publications with him, but was sure he could find some.